[L.A. No. 31121. Sept. 15, 1980.]

Conservatorship of the Person and Estate of
GLENN GAYLE HOFFERBER.
BRUCE A. ALTMAN, as Conservator, etc.,
Petitioner and Respondent, v.
GLENN GAYLE HOFFERBER, Objector and Appellant.

COUNSEL

Quin Denvir, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, Harold E. Shabo and Paul D. Fogel, Deputy State Public Defenders, Wilbur F. Littlefield, Public Defender, Dennis A. Fischer, David Meyer and John L. Ryan, Deputy Public Defenders, for Objector and Appellant.

John H. Larson, County Counsel, Wayne R. Parrish and Michael J. Harrington, Deputy County Counsel, for Petitioner and Respondent.

OPINION

NEWMAN, J.—Glenn Hofferber appeals from a 1978 judgment and order establishing a civil conservatorship under the Lanterman-Petris-Short (LPS) Act. (Welf. & Inst. Code, §§ 5000 et seq., 5350 et seq. Subsequent statutory references are to the Welfare and Institutions Code unless otherwise indicated.)

The conservatorship is based on findings that appellant is "gravely disabled" because he is an incompetent defendant charged with a violent felony. (§ 5008, subd. (h)(2).) We conclude that the judgment and order must be reversed.

After a September 1974 preliminary hearing appellant was charged with murder. In November 1974 he was found mentally incompetent to stand trial and was committed to the Department of Health for place-

ment in a state hospital (Pen. Code, § 1368 et seq.). There he was entitled to periodic six-month review of his competence (*id.*, § 1370, subd. (b)(1)).

In 1976 he was returned to the criminal court for the required 18-month hearing (§ 1370, subd. (b)(2)). Again he was found incompetent to stand trial and was recommitted to the state hospital.

In October 1977, because he had been confined for the maximum three-year period permitted by section 1370, subdivision (c)(1) and the Department of Health determined there was no substantial likelihood he would regain mental competence in the foreseeable future (§ 1370, subd. (b)(1)), again he was returned to the criminal court (§ 1370, subd. (c)(2)). In December 1977 a unanimous jury by a preponderance of the evidence found him incompetent to stand trial. Thereafter Judge Chernow, noting that appellant had been the subject of an earlier conservatorship which had terminated prior to the alleged murder, had admitted the killing ("I just let him have it"),[1] and had announced his aim to drive a stake through the heart of a relative, concluded that (1) he was incompetent to stand trial and "would constitute a danger to the safety of others if he were free of secure custody," and (2) he appeared to be "gravely disabled" within the meaning of section 5008, subdivision (h)(2). Accordingly, Judge Chernow directed the public guardian to initiate civil conservatorship proceedings under the LPS Act. (Pen. Code, § 1370, subd. (c)(2).)

In the conservatorship proceedings Judge Ziskrout denied appellant's request for a second jury trial on the issue of mental competence and, at the guardian's request, took judicial notice of the December 1977

[1]The alleged killing apparently occurred during a dispute between appellant and an employee of the plant where he had worked. Appellant, whose many names include Cookie Lasagna, arrived at the plant in a specially tailored, 10-star-general's uniform befitting his self-proclaimed position as Commander-in-Chief of the armed forces. He began operating an electric saw to modify a paint brush he uses in his work as a "professional neurosurgeon." The victim, Darrell Yearwood, a "montclape" (appellant's term for most black people), ordered him out; a fight started; and appellant shot Yearwood with a .22-caliber pistol he had brought.

In various incarnations appellant perceives himself as God and the President of the United States (and thus as supreme director of the FBI, the CIA, etc.). He was secret president by arrangement with Lyndon Johnson, but only Dwight Eisenhower was fully aware of his mission. He has deposited substances which will change everything at secret locations near the United Nations and in the Los Angeles sewer system. He states he has weapons stored around the country.

He views the killing as self defense or justifiable homicide. He has repeatedly asked for a criminal trial and has opposed defense counsel's wish to enter an insanity plea.

competence hearing. On March 6, 1978, Judge Ziskrout found appellant "gravely disabled." The guardian was appointed conservator of appellant's person and estate and was authorized to place him in a state hospital or other mental health facility. (§§ 5350, 5358.)

Appellant asserts that (1) a person charged with a violent felony and found mentally incompetent to stand trial may not be civilly committed for reasons and under procedures that differ from those applicable to other mentally disordered persons, (2) to establish grave disability his incompetency must be proved beyond a reasonable doubt, and (3) his conservatorship violates the proscription of retroactive or ex post facto laws. We examine each contention separately.[2]

## VALIDITY OF COMMITMENT STANDARDS

Before 1974, California law provided that persons charged with criminal conduct but found incompetent to stand trial were committed to state hospitals until they became "sane" (i.e., competent). Because attainment of competence was the sole standard for release the commitments were indefinite, even permanent, so long as incompetence persisted. (Former Pen. Code, §§ 1368-1370; see Parker, *California's New Scheme for the Commitment of Individuals Found Incompetent to Stand Trial* (1975) 6 Pacific L.J. 484, 486.)

In *Jackson* v. *Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845] the Supreme Court struck down similar provisions on grounds that they denied equal protection and due process. The equal protection ruling arose from the premise that persons could not, solely because of pending criminal charges against them, be subject to commitment standards more lenient or release standards more stringent than those applicable to persons not charged with criminal offense.

---

[2]The March 1978 conservatorship order here challenged expired by terms of the LPS Act's "gravely disabled" provisions in May 1979 and is therefore technically moot. (§ 5361.) Yet the issues are of recurring importance. (*Diamond* v. *Bland* (1970) 3 Cal.3d 653, 657 [91 Cal.Rptr. 501, 477 P.2d 733], cert. den. *sub nom. Homart Development Co.* v. *Diamond* (1971) 402 U.S. 988 [29 L.Ed.2d 153, 91 S.Ct. 1661], reh. den., 404 U.S. 874 [30 L.Ed.2d 120, 92 S.Ct. 27], (1972) 405 U.S. 981 [31 L.Ed.2d 257, 92 S.Ct. 1189], 409 U.S. 897 [34 L.Ed.2d 154, 93 S.Ct. 91]; *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58-59 [13 Cal.Rptr. 663, 362 P.2d 487].) Moreover, LPS Act conservatorship was renewed and appellant reconfined in 1979 on substantially identical findings.

An appeal from the 1979 order, raising similar issues, is pending before the Court of Appeal. (*Conservatorship of Hofferber*, 2 Civ. 57096.) No party urges us to dismiss the appeal from the 1978 order. Thus we decide the case on its merits.

Under Indiana law, other mentally disordered persons could be committed and involuntarily confined only if dangerous or in need of custodial care or treatment. Mentally disordered criminal defendants, however, were committed and confined solely on the basis of inability to assist at trial. Their confinement continued as long as that condition persisted, regardless of whether confinement was necessary for treatment or for their or others' protection. Since pendency of unproved criminal charges was not a reasonable basis for distinction among mentally ill persons, *Jackson* reasoned, Indiana law denied incompetent criminal defendants equal protection. (P. 730 [32 L.Ed.2d p. 446].)

*Jackson* held that the procedures also denied due process because, solely for incompetence, they permitted confinement beyond a period "reasonably related" to the aims of commitment. The court reasoned as follows: Commitment solely for incompetence is intended to permit treatment to alleviate that condition. Hence, confinement on that ground may not continue beyond the time reasonably necessary to determine whether the purpose of treatment is being served.

Once there appears no substantial likelihood that defendant will regain competence, *Jackson* concluded, the state must justify further confinement by showing that it is necessary on some ground applicable to all mentally ill persons, such as dangerousness or need for custodial care. The court adopted a "rule of reason" that, once hopeless incompetence appears, "the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." (P. 738 [32 L.Ed.2d p. 451]; cf. *Greenwood* v. *United States* (1956) 350 U.S. 366, 373-374 [100 L.Ed. 412, 418, 76 S.Ct. 410].)

Following *Jackson*, this court invalidated indefinite commitments under California procedures for confinement of incompetent criminal defendants. (*In re Davis* (1973) 8 Cal.3d 798, 805-806 [106 Cal.Rptr. 178, 505 P.2d 1018], cert. den. *sub nom. Palma* v. *California*, 414 U.S. 870 [38 L.Ed.2d 88, 94 S.Ct. 87].) *Davis* held that, once defendant's progress toward competence became unlikely, "the court should either order him released from confinement or initiate appropriate alternative commitment proceedings under the [LPS] Act...." (*Id.*, at p. 807.)[3]

---

[3]Though Jackson had been deemed hopelessly incompetent, hearings on his continued confinement never had addressed any other basis of state power to confine the mentally ill. The Supreme Court doubted he could be committed for dangerousness on the basis of the misdemeanor charges pending against him. Also, though his hopeless

When *Davis* was decided those proceedings included (1) annually renewable conservatorships for "gravely disabled" persons—those mentally unable to provide their "basic personal needs for food, clothing, or shelter..." (§§ 5008, subd. (h)(1), 5350 et seq.), and (2) 90-day maximum confinements for "imminently dangerous" persons, renewable only for violence while confined. (§ 5304.)

Adapting the LPS Act language in *Davis*, the Legislature in 1974 amended the statutes to bring California's scheme for confinement of incompetent criminal defendants within constitutional bounds. (Stats. 1974, ch. 1511, p. 3316 et seq.) Under current law a defendant confined for incompetence who has not regained competence must be returned to the superior court after (1) three years, or (2) the maximum term of imprisonment for the most serious underlying offense, whichever is shorter (Pen. Code, § 1370, subd. (c)(1)), or whenever the superintendent of the treatment facility sooner determines there is no substantial likelihood the defendant will attain competence (§ 1370, subd. (b)(1)).[4] The court then must redetermine competence. If defendant is competent, criminal proceedings are resumed. If not the court must either

---

deafness and inability to communicate rendered him incompetent to stand trial they did not appear to require custodial care. (406 U.S. at pp. 727-728 [32 L.Ed.2d at p. 445].)

The defendants in *Davis*, also accused of nonviolent misdemeanors, never had been deemed hopelessly incompetent. This court therefore continued their confinement but ordered prompt progress reports and resolution of the progress issue within a reasonable time. (8 Cal.3d at p. 806.)

[4]Section 1370, subdivision (c)(1) provides: "If, at the end of three years from the date of commitment or a period of commitment equal to the maximum term of imprisonment provided by law for the most serious offense charged in the information, indictment, or misdemeanor complaint, whichever is shorter, the defendant has not recovered his mental competence, he shall be returned to the committing court. The court shall notify the county mental health director or his designee of such return and of any resulting court orders."

Section 1370, subdivision (b)(1) provides: "Within 90 days of a commitment made pursuant to subdivision (a), the superintendent of the state hospital or other facility to which the defendant is committed or from which the defendant is placed on outpatient treatment shall make a written report to the court and the county mental health director or his designee concerning the defendant's progress toward recovery of his mental competence. If the defendant has not recovered his mental competence, but the report discloses a substantial likelihood the defendant will regain his mental competence in the foreseeable future, he shall remain in the state hospital or other facility or on outpatient treatment. Thereafter, at six-month intervals or until the defendant becomes mentally competent, the superintendent of the hospital or person in charge of the facility shall report to the court and the county mental health director or his designee regarding the defendant's progress toward recovery of his mental competence. If the report indicates that there is no substantial likelihood that the defendant will regain his mental competence in the foreseeable future, the committing court shall order him to be returned to the court for proceedings pursuant to paragraph (2) of subdivision (c). The court shall transmit a copy of its order to the county mental health director or his

release him or order that "gravely disabled" conservatorship proceedings be instituted under the LPS Act (§ 1370, subd. (c)(2)).[5]

The Legislature also amended section 5008, subdivision (h), which defines grave disability. The revised section retains the traditional concept of helplessness (subd. (h)(1)) but adds an alternative definition based on criminal incompetence. A person now may be found "gravely disabled" on grounds that he (1) is charged by indictment or information with a felony involving death, great bodily harm, or a serious threat to the physical well-being of another, and (2) is incompetent to assist in his defense because of a mental disorder.[6] His conservatorship may be renewed annually so long as those conditions persist.

■ Appellant argues that the new scheme is a transparent and unsuccessful evasion of *Jackson* and *Davis*. Despite the law's attempt to make incompetents committable under the "customary" civil commitment law, he suggests, it still denies them equal protection because their incompetence bears no rational relationship to the "grave disability"

---

designee." (Cf. Note, *Procedural Safeguards for Periodic Review: A New Commitment to Mental Patients' Rights* (1979) 88 Yale L.J. 850.)

[5]Section 1370, subdivision (c)(2) provides: "Whenever any defendant is returned to the court pursuant to paragraph (2) of subdivision (b) or paragraph (1) of subdivision (c) and it appears to the court that the defendant is gravely disabled as defined in paragraph (2) of subdivision (h) of Section 5008 of the Welfare and Institutions Code, the court shall order the conservatorship investigator of the county of commitment of the defendant to initiate conservatorship proceedings for such defendant pursuant to Chapter 3 (commencing with Section 5350) of Part 1 of Division 5 of the Welfare and Institutions Code. Any hearings required in the conservatorship proceedings shall be held in the superior court in the county which ordered the commitment. The court shall transmit a copy of the order directing initiation of conservatorship proceedings to the county mental health director or his designee."

[6]Section 5008 now provides in pertinent part: "(h) For purposes of Article 1 (commencing with Section 5150), Article 2 (commencing with Section 5200), and Article 4 (commencing with Section 5250) of Chapter 2 of this part, and for the purposes of Chapter 3 (commencing with Section 5350) of this part, 'gravely disabled' means:

"(1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter; or

"(2) A condition in which a person, has been found mentally incompetent under Section 1370 of the Penal Code and all of the following facts exist:

"(i) The indictment or information pending against the defendant at the time of commitment charges a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person.

"(ii) The indictment or information has not been dismissed.

"(iii) As a result of mental disorder, the person is unable to understand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of his defense in a rational manner."

provisions of the LPS Act. *Jackson* and *Davis*, he urges, make unproved criminal charges and a subsequent finding of incompetence insufficient grounds for any distinction, procedural or substantive, from other persons subject to civil commitment. Since he has been found hopelessly incompetent, he contends, he may now be civilly committed only under LPS Act provisions not dealing with criminal incompetence.

He also asserts that the new scheme denies due process because it allows indefinite commitment of hopeless incompetents on that ground alone, without any new showing that they are dangerous, helpless, or otherwise in need of further confinement. Therefore, he concludes, he must be released unless his confinement can be justified under laws articulating one or more of those grounds.

The conservator responds that the new commitment procedures do meet constitutional standards because they follow a determination of probable cause to believe defendant committed a violent felony. (See Pen. Code, § 1368.1, subd. (a); § 5008, subd. (h)(2); *Hale* v. *Superior Court* (1975) 15 Cal.3d 221, 226-228 [124 Cal.Rptr. 57, 539 P.2d 817].)[7] Separate treatment and indefinite confinement of such a defendant, he contends, are justified on grounds of public safety because the probable criminal conduct evidences extraordinary dangerousness.[8]

We agree that the rulings of *Jackson* and *Davis* are not satisfied by placing arbitrary and discriminatory confinement standards for criminal incompetents in the civil commitment statutes. However, we do not regard those cases as holding that the fact of criminal incompetency may never be a basis for involuntary confinement prescriptions.

The state has compelling interests in public safety and in humane treatment of the mentally disturbed. (Cf. Turnbull, *Law and the*

---

[7]Penal Code section 1368.1, subdivision (a) provides that filing of an indictment or information must precede incompetence proceedings. Section 5008, subdivision (h)(2) limits "gravely disabled" criminal incompetents to those against whom indictments or informations charging violent felonies are pending. (Subd. (h)(2)(i), (ii).)

[8]The conservator concedes that, because a fundamental liberty interest is at stake, strict scrutiny is the correct standard of review. (*In re Moye* (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097]; *People v. Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375]; see *In re Gary W.* (1971) 5 Cal.3d 296, 306-307 [96 Cal.Rptr. 1, 486 P.2d 1201]. Cf. Spece, *Justifying Invigorated Scrutiny and the Least Restrictive Alternative as a Superior Form of Intermediate Review: Civil Commitment and the Right to Treatment as a Case Study* (1979) 21 Ariz.L.Rev. 1049.)

*Mentally Retarded Citizen: American Responses to the Declarations of Rights of the United Nations and International League of Societies for the Mentally Handicapped—Where We Have Been, Are, and Are Headed* (1979) 30 Syracuse L.Rev. 1093.)[9] It may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. (*Baxstrom v. Herold* (1966) 383 U.S. 107, 111 [15 L.Ed.2d 620, 623-624, 86 S.Ct. 760]; *In re Gary W., supra*, 5 Cal.3d 296, 304.) Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of state power.

■ California laws have long followed that premise. For certain purposes they properly classify, separately, those mentally ill persons against whom a judicial determination of criminal conduct has been made since such persons, at least initially, have demonstrated particular danger. (See *In re Moye, supra*, 22 Cal.3d 457, 462; *In re Franklin* (1972) 7 Cal.3d 126, 146 [101 Cal.Rptr. 553, 496 P.2d 465].)

The California scheme permits long-term, renewable commitments of persons found not guilty by reason of insanity (Pen. Code, § 1026 et seq.), mentally disordered sex offenders (MDSO's) (§ 6300 et seq.), and those committed to the Youth Authority (§ 1800 et seq.; *People v. Smith* (1971) 5 Cal.3d 313, 317 [96 Cal.Rptr. 13, 486 P.2d 1213])—in each case on proof that they remain dangerously disturbed. On the other hand, violent persons not adjudicated under the criminal justice system are subject only to the short-term LPS Act procedure for "imminently dangerous" persons. They, unlike those criminally committed, may not be confined indefinitely on psychiatric opinion alone. (§§ 5300, 5304.)

Those distinctions have two apparent bases. First, the Legislature apparently concluded that short-term civil confinement is preferable for

[9]Interestingly, at its 1979 session the United Nations Sub-Committee on Prevention of Discrimination and Protection of Minorities requested the United Nations Secretary-General to prepare a report "with a view to the formulation of guidelines" regarding:

"(a) the medical measures that may properly be employed in the treatment of persons detained on the grounds of mental ill-health, and

"(b) procedures for determining whether adequate grounds exist for detaining such persons and applying such medical measures.

"The resolution arose from the allegations that in some countries, persons are confined to mental health clinics against their will, as a method of punishment for their political views or non-violent exercise of their human rights." (U.N. Press Release HR/799, 7 Sept. 1979.)

most violent incidents caused by mental disturbance and that only seriously dangerous persons should be subject to the trauma and stigma of longer-term confinement. (Parker, *supra*, 6 Pacific L.J. at pp. 501-502.) On the other hand, it was considered that acts serious enough for criminal treatment justify a continuing special interest in a person's nonpenal confinement for purposes of public safety. (See *In re Moye, supra*, 22 Cal.3d at p. 462; *In re Franklin, supra*, 7 Cal.3d at pp. 145-146; *In re Gary W., supra*, 5 Cal.3d 296, 304.) Weighing the compelling interest in avoiding confinement whenever possible against the equal need to protect society from the seriously dangerous mentally ill, the Legislature has naturally concluded that statutory distinctions must be made on the basis of degree of danger presented.[10]

For the same reasons, some separate treatment of permanently incompetent criminal defendants formally charged with violent felonies is justified. Allegedly they have engaged in violence so critical that serious criminal charges were believed appropriate. Magistrates or grand juries have found substantial evidence that the alleged conduct actually was committed as alleged. Those determinations of probable cause establish strong grounds to believe that, by concrete acts, the incompetent defendants already have seriously imperiled public safety and thus are particularly dangerous. Yet because of permanent incompetence they

---

[10]*Jackson* said that "*[i]f criminal conviction and imposition of sentence* are insufficient" to apply lesser "procedural and substantive protection against indefinite commitment" than is available to other persons, "the mere filing of criminal charges surely cannot suffice." (406 U.S. at p. 724 [32 L.Ed.2d at p. 443], italics added.) For that proposition the court relied on *Baxstrom* v. *Herold, supra*, 383 U.S. 107; *Humphrey* v. *Cady* (1972) 405 U.S. 504 [31 L.Ed.2d 394, 92 S.Ct. 1048]; *Bolton* v. *Harris* (D.C.Cir. 1968) 395 F.2d 642, and *People* v. *Lally* (1966) 19 N.Y.2d 27 [277 N.Y.S.2d 654, 224 N.E.2d 87]. *Baxstrom* and *Humphrey*, however, dealt with *procedural* safeguards denied *persons nearing the end of their penal confinements*. No justification was perceived for classifying persons as "particularly dangerous" and therefore deserving of less procedural protection against civil commitment than others solely because their criminal trials had resulted in penal restraint about to expire. (*Humphrey, supra*, 405 U.S. at pp. 510-511 [31 L.Ed.2d at pp. 403-404]; *Baxstrom, supra*, 383 U.S. at pp. 114-115 [15 L.Ed.2d at pp. 625-626].)

*Bolton* and *Lally*, though nullifying local statutes for automatic commitment of the criminally insane, acknowledged the state's right to make reasonable distinctions between civilly and criminally committed persons. (*Bolton, supra*, 395 F.2d at p. 651; *Lally, supra*, 224 N.E.2d at pp. 90-91.)

In *Franklin* we concluded that *Baxstrom, Bolton*, and *Lally* did not preclude California's automatic prehearing commitment provisions from being applied solely to the criminally insane. (7 Cal.3d at pp. 139-142.) Read in context, *Jackson* stands only for the proposition that consideration of prior criminal conduct as a basis for distinguishing among dangerous persons must be reasonable.

cannot be evaluated and confined for continuing dangerousness under the criminal processes usually applied to serious violent conduct.[11]

We do not gainsay society's interest in protection against violent, incompetent, criminal defendants. As with those finally adjudicated to be criminally disordered on the basis of prior conduct, that interest continues so long as continuing dangerousness can be shown. (Compare *Moye, supra*, 22 Cal.3d at p. 462; *Franklin, supra*, 7 Cal.3d at pp. 145-146.)[12] The Legislature therefore may provide for the confinement of those persons, on grounds of violent dangerousness, under a scheme different from traditional, short-term, civil commitment.[13] An LPS conservatorship, with its multiple procedural safeguards and emphasis on treatment (see § 5352.6), is a proper means to achieve that end.

Accordingly we conclude that under a separate statutory scheme the state may confine incompetent criminal defendants, *on grounds that they remain violently dangerous*, when a magistrate or grand jury has found probable cause to believe that they have committed violent felonies.

The statutes, however, do not expressly require a showing of continuing dangerousness. They appear to permit indefinite maintenance of

[11]*Jackson* concluded that an incompetent criminal defendant could be held solely on grounds of his continuing incompetence only for the time reasonably necessary to determine whether further hospital treatment is likely to assist his restoration to competence. The current California scheme responds by providing that confinement under the Penal Code shall cease once there is no substantial likelihood of restoration to competence, with a maximum confinement of three years. (§ 1370, subds. (b)(1), (c)(1).) The assumption is that three years is a reasonable time to reach a prognosis; persons not restored to competence by that time are, in effect, treated as permanently incompetent. (There is some indication here that hospital authorities do believe appellant will never improve.)

[12]We distinguish *People* v. *Smith, supra*, 5 Cal.3d 313, which found no rational basis for differing periods of extended confinement for "presently dangerous" Youth Authority inmates who had served their original terms, depending on whether they had originally been convicted in adult court or committed under the juvenile law. (P. 318.) By contrast, the Legislature properly treats with continuing concern those particularly dangerous persons whose violent conduct warranted felony charges but whose mental disorders preclude possibility of confinement under criminal law.

[13]A distinction of this kind is not invalid for the reason that theoretically it allows alternative treatment of particular conduct depending on whether criminal charges were filed and pursued. (See §§ 5300, 5304 [actual violence or infliction of harm necessary for traditional civil commitment].) Such an argument would apply to all separate treatment arising from decisions by public authorities whether to prosecute, including that provided for the criminally insane and MDSO's.

LPS conservatorships solely because the incompetence continues and the violent felony charges have not been dismissed. (§ 5008, subd. (h)(2).) Thus, so that *Jackson* and *Davis* may be respected, the conservator requests that we read a "dangerousness" requirement into the new LPS Act provisions. In *Franklin*, analogously, we ruled that "restoration to sanity," the standard for release of criminally insane persons (Pen. Code, § 1026.2, former § 1026a), was satisfied when they no longer represented a danger to health and safety. (7 Cal.3d at p. 145.)[14]

█ If feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality. (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 253-254 [158 Cal.Rptr. 330, 599 P.2d 636]; *In re Edgar M.* (1975) 14 Cal.3d 727, 736-737 [122 Cal.Rptr. 574, 537 P.2d 406].) █ Clearly the Legislature's focus on violent felony charges reflects a concern as to dangerousness in criminal incompetency cases similar to that previously evidenced in the criminal insanity provisions. Appellant rejects that inference and argues that the Legislature in 1974 intended to preclude dangerousness as a basis for confinement. The history he provides, though, contradicts his contention.

In 1973 hearings on the *Jackson-Davis* problem (Assem. Select Com. on Mentally Disordered Criminal Offenders, Dec. 13-14, 1973) legislators, health professionals, and the Attorney General's representative contended that incompetents charged with violent felonies warranted special treatment precisely because their past conduct implied future danger. Participants in the hearings also feared that many of those persons, while delusional and potentially violent if released, would "slip through the cracks" if they neither behaved violently in short-term confinement (a requirement for renewal of 90-day "imminent threat" commitments under the LPS Act) nor could be proved unable to care for themselves (necessary for a traditional LPS Act "gravely disabled" conservatorship).

---

[14]Under 1979 amendments, criminally insane persons whose offenses occurred after July 1, 1977, the operative date of the original determinate sentence law (DSL), may not be held under section 1026 longer than their upper DSL terms, except that renewable two-year extended commitments are imposable on persons who committed specified felonies threatening or inflicting death or serious bodily injury and "who by reason of a mental disease, defect, or disorder [represent] a substantial danger of physical harm to others." (Pen. Code, § 1026.5.)

Appellant also argues that we may not prescribe a dangerousness requirement since we cannot identify which of the several "danger" definitions appearing in California statutes the Legislature itself would apply to criminal incompetents. (See, e.g., § 1800 [extended commitment of Youth Authority inmate *"physically dangerous* to the public" because of "mental or physical deficiency, disorder, or abnormality"]; § 5304 [90-day civil commitment of one who has attempted or inflicted physical harm "and who, as a result of mental disorder, presents an *imminent threat* of substantial physical harm to others"]; § 6300 [MDSO defined as one whose "mental defect, disease, or disorder" predisposes him to sexual offense "to such a degree that he is dangerous to the health and safety of others"]; § 6316.2 [extended commitment of MDSO whose mentally disordered propensity for sex offenses presents a "substantial danger of bodily harm to others"]; § 6500 [commitment of mentally retarded person who is a "danger to himself or others"]. Italics added; see also Pen. Code, § 1026.5, subdivision (b)(1) (fn. 14, *ante*).)

The distinctions among those definitions appear more form than substance. To the extent the words do differ materially we have little difficulty in choosing an appropriate standard. As with the criminally insane, the Legislature was concerned here about persons whose seriously dangerous propensities had apparently already surfaced in violent conduct of felonious magnitude and whose mental conditions created a substantial possibility that they might commit further violence if freed from extended supervision, confinement, and treatment.

The criminal insanity provisions thus seem to be the most closely analogous, and the Legislature recently has clarified the degree of "dangerousness" that in such cases justifies extended commitment. We conclude that we can best accommodate both the Constitution and the legislative intent by adapting that standard to the LPS Act provisions for criminal incompetence. (Cf. *In re Moye, supra*, 22 Cal.3d at p. 467; *In re Edgar M., supra*, 14 Cal.3d at pp. 736-737.)

We therefore hold that every judgment creating or renewing a conservatorship for an incompetent criminal defendant under section 5008, subdivision (h)(2) must reflect written findings that, by reason of a mental disease, defect, or disorder, the person represents a substantial

danger of physical harm to others. (See Pen. Code, § 1026.5, subd. (b)(1).)[15] We uphold the 1974 amendments as so construed.

■ The conservator suggests that the requisite finding here is implicit in the initial probable cause determination of violent felonious conduct and that no supplementary finding or evidence is necessary. We disagree. We have indicated that the initial determination of probable cause, coupled with the defendant's continuing incompetence, permits separate legislative concern and treatment. For several reasons, however, it cannot give rise to a permanent, conclusive presumption of continuing dangerousness.

First, the homicide alleged here took place in 1974; and no court ever has found beyond a reasonable doubt that appellant committed it. Nor has there been a determination that either the criminal act or any current dangerousness is the product of a mental disease, defect, or disorder. Even if he had a dangerous mental condition in 1974 the passage of time by itself diminishes the validity of an assumption that his dangerousness continues unabated.

Second, a conclusive presumption of current dangerousness would deny equal protection. The criminally insane—against whom findings of criminal conduct produced by a mental condition have been made—are conclusively presumed dangerous only until completion of trial and the subsequent, automatic, 90-day commitment for observation of their current mental conditions. (Pen. Code, §§ 1026, subd. (a), 1026.2.) Thereafter, whenever they are no longer dangerous they must be released. (*Id.*, §§ 1026.2, 1026.5; *Franklin, supra*, 7 Cal.3d at p. 145.) No rational basis appears for conclusively presuming an unconvicted, incompetent defendant dangerous for a longer period than one found criminally insane.

Third, at the time of his 1978 conservatorship hearing appellant already had been confined in a hospital for the three-year treatment period provided by the Penal Code. Psychiatric impressions gained during such a period of observation obviously are relevant and important means of determining whether a person once violent remains so. A con-

---

[15]We decline appellant's invitation to apply the "imminent threat" standard for 90-day civil commitments under the LPS Act. (§ 5304.) That 90-day provision is intended to deal with less serious, episodic violence on a short-term basis by requiring release once the immediate danger has passed. The Legislature obviously felt that violence represented by serious crime calls for longer-range protection.

clusive presumption of continuing dangerousness would be arbitrary if extended beyond the period reasonably necessary for hospital evaluation of a defendant's current propensity for violence. Under the existing scheme for incompetent criminal defendants, ample opportunity for evaluation exists during their confinement under the Penal Code. (Cf. *Jackson, supra,* 406 U.S. at p. 738 [32 L.Ed.2d at pp. 450-451]; *Davis, supra,* 8 Cal.3d at pp. 806-807.)

Accordingly, an LPS Act determination that an incompetent criminal defendant is "gravely disabled" because he is currently dangerous as the result of a mental disease, defect, or disorder must follow a hearing addressed to that specific issue. (See *Jackson, supra,* 406 U.S. at pp. 737-738 [32 L.Ed.2d at p. 450]; *Humphrey, supra,* 405 U.S. at p. 511 [31 L.Ed.2d at pp. 403-404].) Since appellant apparently had no such hearing he was denied equal protection and due process. The conservatorship order thus must be reversed.[16]

### STANDARD OF PROOF AND JURY TRIAL

■ Appellant further contends that his grave disability for LPS Act purposes must be established beyond a reasonable doubt and that he was entitled to a unanimous jury verdict on that issue. We agree that in any subsequent trial under section 5008, subdivision (h)(2) appellant's dangerous mental condition must be found beyond a reasonable doubt and, if appellant insists, by a unanimous jury. The law does not, though, require an equally stringent showing of incompetence.

Involuntary confinement for mental illness or dangerousness, whether civil or criminal, involves loss of liberty and substantial stigma. Fact-finding error must be minimized when such drastic consequences are at stake. Hence, the facts that trigger confinement must generally be proved to a unanimous jury beyond a reasonable doubt. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 229-230, 232-233 [152 Cal.Rptr. 425, 590 P.2d 1] [traditional "gravely disabled" conservatorship]; *Peo-*

---

[16]In the 1977 competence hearing Judge Chernow noted that appellant had admitted the killing and had made references to driving a stake through a relative's heart. He found, among other things, that appellant would be dangerous if free of secure confinement. The "stake" reference and the 1974 conduct, though relevant to a finding of current dangerousness, are not conclusive as to appellant's current propensities. Appellant's admission adds little or nothing of importance.

The crucial fact is that the conservator refers us to no point in the 1977 competence hearing or the March 1978 conservatorship proceeding at which new evidence addressed directly to appellant's present dangerousness was received or considered.

*ple* v. *Thomas* (1977) 19 Cal.3d 630, 633 [139 Cal.Rptr. 594, 566 P.2d 228]˙ [narcotics addict]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 349-358 [121 Cal.Rptr. 509, 535 P.2d 373] [MDSO—unanimous jury]; *People* v. *Burnick* (1975) 14 Cal.3d 306, 322 [121 Cal.Rptr. 488, 535 P.2d 352] [MDSO—reasonable doubt standard]; but cf. *In re Roger S.* (1977) 19 Cal.3d 921, 938-939 [141 Cal.Rptr. 298, 569 P.2d 1286] [parental commitment of minor—no judicial hearing or jury trial].) Since a dangerous mental condition is the sole basis on which continued confinement of a permanent incompetent can be justified under the new "gravely disabled" provisions, that fact must be established under strictest standards.[17]

■    We do not, however, reach a parallel conclusion on the requirement of continuing incompetence. So long as a defendant is adjudged incompetent by a preponderance of evidence, the criminal trial and disposition of the charged offenses are impossible. (Pen. Code, §§ 1369, 1370.) It is the preponderant judgment of incompetence that removes defendant from the criminal justice system and creates the need for non-penal protection against his continuing dangerousness. It would be anomalous if indefinitely he could avoid penal treatment by consecutive, preponderant judgments that he was incompetent and then, though dangerous, also avoid LPS Act confinement as a "gravely disabled" person because incompetence could not be established beyond a reasonable doubt. (Cf. *In re Franklin, supra,* 7 Cal.3d at pp. 146-147.)

A preponderance standard for LPS Act incompetency will not increase the risk of error in determining material issues. It is the fact of a prior incompetence finding and the legal effect of that finding, rather than incompetence itself, that form the bases for civil commitment. No purpose seems served by requiring a more stringent proof of the underlying condition in order to establish an LPS Act conservatorship.

We hold therefore that incompetence for purposes of section 5008, subdivision (h)(2) may be established by a preponderance of evidence. If initial conservatorship proceedings follow within a reasonable time after defendant has been found incompetent in criminal court, the con-

---

[17]The conservator notes that under the "gravely disabled" provisions confinement is not automatic but subject to the conservator's controlled discretion. (§§ 5358, 5361, 5364.) *Roulet* rejected the notion that such discretion justified less procedural protection at the factfinding stage than where confinement is obligatory. (23 Cal.3d at pp. 222-223, 228-230.) Appellant has been confined continuously since 1974.

servatorship adjudicators may by judicial notice rely on the prior finding. Any renewal of the conservatorship must, of course, be based on updated evidence of the conservatee's incompetence.

### VALIDITY OF APPLYING 1974 AMENDMENTS TO PRIOR HOMICIDE

■ Finally appellant argues that to apply the 1974 amendments to him would violate constitutional limitations on retroactive and ex post facto laws, since the alleged homicide occurred before the amendments became effective. We do not agree.

The ex post facto clauses (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9) apply only to penal statutes. They prohibit retrospective laws that (1) impose criminal liability for conduct innocent when it occurred, (2) increase the punishment prescribed for a crime at the time it was committed, or (3) by necessary operation and "'in [their] relation to the offense, or [their] consequences, alter the situation of the accused to his disadvantage....'" (*People* v. *Ward* (1958) 50 Cal.2d 702, 707 [328 P.2d 777], cert. den. (1959) 359 U.S. 945 [3 L.Ed.2d 678, 79 S.Ct. 730], disapproved on other grounds, *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *Thompson* v. *Utah* (1898) 170 U.S. 343, 351 [42 L.Ed. 1061, 1066-1067, 18 S.Ct. 620]; and see *Medley, Petitioner* (1890) 134 U.S. 160, 171 [33 L.Ed. 835, 840, 10 S.Ct. 384]; *In re Dewing* (1977) 19 Cal.3d 54, 57 [136 Cal.Rptr. 708, 560 P.2d 375].)

Appellant argues that the 1974 amendments did increase the punishment for the earlier homicide. He relies principally on *In re Valenzuela* (1969) 275 Cal.App.2d 483 [79 Cal.Rptr. 760]. There a minor had been committed without jury trial to the Youth Authority for a 1960 sex offense. Under statutes then in effect, that "criminal" commitment would have expired when the minor turned 21 in 1966. In 1963, however, the Legislature amended the Welfare and Institutions Code to permit potentially unlimited two-year extensions of confinement for Youth Authority inmates deemed presently dangerous because of physical or mental deficiency. (§§ 1800, 1802.) No jury trial was provided on dangerousness.

The *Valenzuela* court rejected contentions that the new confinement provisions were not penal. It stressed that the aim of the new statute was protection of society and not rehabilitation, that defendant was confined at Deuel, a maximum security institution, and that he could be

transferred to state prison if necessary. The 1963 legislation, it said, "viewed as a system," was therefore penal rather than civil. (P. 487.)

The court also rejected arguments that the 1963 legislation was not ex post facto because it focused on current dangerousness rather than antecedent criminal conduct. But for the 1960 criminal commitment and the incarceration it produced, said the court, defendant in 1966 could only have been confined under civil statutes providing greater procedural protections, including jury trial. (*Ibid.*; see § 5000 et seq.)

Appellant here argues that, when the homicide with which he is charged occurred, California statutes—as limited by *Jackson* and *Davis*—permitted confinement of criminal incompetents only for treatment or under then-existing civil commitment laws applicable to all other persons. They prescribed indefinite commitment only for helplessness, and sharply limited confinement for dangerousness. (§§ 5300 et seq., 5350 et seq.) The 1974 amendments, however, subjected him to indefinite confinement for incompetence, regardless of whether he was helpless. As in *Valenzuela*, he urges, the potential for increased confinement, even if based on present incompetence or dangerousness, arose only because of the pre-amendment homicide. Therefore, he reasons, his "punishment" for that "criminal conduct" has been increased ex post facto.

Mr. Valenzuela's exposure to extended confinement, however, arose directly from his commitment to a penal institution, for a criminal offense. By extending, after the fact, the length of time he could be incarcerated as a result of his criminal commitment the Legislature effectively increased his potential punishment after the crime had taken place.

The 1974 LPS Act provisions, by contrast, have nothing to do with any punitive disability attached to the homicide charged against appellant at the time it occurred. They did not alter or affect the sentence for that crime. They did not extend, directly or indirectly, any incarceration that had been or could be imposed on appellant for criminal conduct. Indeed, because of appellant's potentially permanent incompetence, a criminal sentence or confinement probably will never be imposed. Unlike Mr. Valenzuela's, appellant's confinement arose not from criminal conduct but from his mental condition. He does not face incarceration

in a prison but must be placed in a state hospital or some other less restrictive setting. (§ 5358.)[18]

We conclude that the 1974 provisions, "viewed as a system," are not penal for purposes of the ex post facto clauses and do not impose punishment for crime, in letter or in spirit. *Valenzuela's* holding that the increased confinement there was unconstitutional because triggered by pre-amendment criminal conduct must be read in the context of procedures that actually extended a period of commitment for criminal conduct. We do not interpret *Valenzuela* to mean that all laws which civilly confine dangerous persons for the protection of society are subject to the ex post facto clauses.

Nor did the 1974 provisions "disadvantage" appellant as an "accused." That branch of ex post facto doctrine relates to circumstances under which a criminal defendant is forced to defend against a verdict of criminal guilt. (*Ward, supra,* 50 Cal.2d at p. 707.) Here no criminal adjudication is involved, and we find no ex post facto violation.

■ Did the 1974 amendments nonetheless operate against appellant with illegal retroactivity? (See *In re Marriage of Bouquet* (1976) 16 Cal.3d 583 [128 Cal.Rptr. 427, 546 P.2d 1371].) We think not.

Whether the new statutes have been applied retroactively depends on how they are characterized. If viewed as changing the legal consequences of homicide committed before their effective date they might be deemed retroactive as to appellant. Statutes that focus on a *continuing dangerous condition,* though, are not retroactive simply because they employ pre-statute conduct as evidence of the ongoing dangerousness. (See *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 177-178 [18 Cal.Rptr. 369, 367 P.2d 865], and dis. opn. of Schauer, J. at pp. 181-185; cf. *Eichelberger* v. *City of Berkeley* (1956) 46 Cal.2d 182, 189 [293 P.2d 1]; *Record* v. *Indemnity Ins. Co.* (1951) 103 Cal.App.2d 434, 444 [229 P.2d 851].)

We need not decide whether the 1974 amendments are being applied retroactively to petitioner. However characterized, we think the Legislature intended them to apply, once effective, to all criminal incompetents

---

[18]We recognize that LPS Act conservatees often are confined at Patton and Atascadero State Hospitals, prisonlike institutions that also house MDSO's convicted of crime. (*Conservatorship of Roulet, supra,* 23 Cal.3d 219, 226; *People v. Burnick, supra,* 14 Cal.3d 306, 319-320.) Appellant has been confined at both institutions.

who are a continuing public danger, whether the violent felony charges by which such persons are initially identified in the amendments occurred before or after the statutes took effect.

The Legislature enacted the 1974 amendments as emergency measures, explicitly intended to fill the gap left by *Davis* in California's commitment scheme. Speedy implementation was declared necessary "for the immediate preservation of the public peace, health, or safety" and to eliminate uncertainty about proper court procedures. (Stats. 1974, ch. 1511, *supra*, § 16, pp. 3323-3324.)

We have held that a legislative attempt to cure an unconstitutional statute may suggest an intent that the curative provision be applied retroactively. (*In re Marriage of Bouquet, supra*, 16 Cal.3d at p. 588; cf. *People* v. *Teron* (1979) 23 Cal.3d 103, 118, fn. 9 [151 Cal.Rptr. 633, 588 P.2d 773].[19]) Moreover, the 1974 amendments seek to protect against a particular class of *potentially* dangerous persons. In such cases, legislative expressions of urgency in the interest of public safety necessarily indicate an attempt to reach all persons in the class who represent the continuing danger even if they fall within the legislative purview partly by reason of prior conduct. (*DiGenova, supra*, 57 Cal.2d at p. 177.)[20]

Appellant's due process rights are not jeopardized by our interpretation. Protection of individuals against danger is among the most fundamental of state interests. Also, dangerous mentally ill persons gain

---

[19]*Teron* held that the 1977 death penalty law could not be applied retroactively to crimes committed before its enactment. The 1977 law had been adopted to replace the 1973 law that this court held unconstitutional in 1976. *Teron* distinguished *Bouquet* on grounds that it involved only property rights, not penal sanctions. *Teron* further noted that the statute in *Bouquet* filled an absolute vacuum created by probable unconstitutionality of prior community property law, while failure to apply the 1977 death-law retroactively would simply reduce defendant's punishment to life imprisonment.

Here, as in *Bouquet*, extreme penal sanctions are not involved. Moreover the Legislature, by noting post-*Davis* "uncertainty" about appropriate procedures for criminal incompetents, articulated its apprehension that a *Bouquet*-style vacuum had arisen.

[20]*Teron, supra*, implicitly rejected the argument that "urgency" and "public protection" expressions showed a legislative intent to make a death penalty law retroactive. (See conc. opn. of Richardson, J., 23 Cal.3d at p. 120; dis. opn. of Clark, J., *id.*, at p. 126.) But again, an important distinction exists between laws that increase *punishment* for *past conduct*, on the one hand, and those authorizing *preventive* confinement of *potentially dangerous* persons on the other. The latter statutes look primarily to the avoidance of future harm; their prophylactic purpose would be thwarted if they applied only to persons whose violent propensities first surfaced after the effective date. Justice Richardson also pointed out in his *Teron* concurrence that death penalty cases are *sui generis* and require a particularly stringent view of retroactive "intent."

no perpetual "vested right" in the commitment scheme extant when their illnesses first came to public attention. To say that they have "reasonably relied" on that scheme in displaying their dangerous conditions is to indulge a patent fiction. Such a rule would severely hamper legislative efforts to respond to new knowledge about mental illness, correct perceived deficiencies in the statutory scheme, and refine the state's machinery for treatment and restraint of dangerously disturbed people. (See *Bouquet, supra*, 16 Cal.3d at pp. 592-593.) We conclude the 1974 amendments may properly govern appellant's commitment.

The judgment and order appealed from are reversed.

Tobriner, J., Mosk, J., and Manuel, J., concurred.

**RICHARDSON, J.**—I concur in the judgment. As the majority opinion explains, any continued confinement of appellant must be supported by a finding that he remains dangerous to himself or others. I respectfully dissent, however, from the majority's further holding that the fact of dangerousness must be established *beyond a reasonable doubt*. Although that strict standard of proof may be appropriate to justify the initial civil commitment of one merely suspected of being gravely disabled by virtue of a mental disorder (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 229-230 [152 Cal.Rptr. 425, 590 P.2d 1]), a lesser standard clearly is appropriate here, based upon a prior probable cause determination that appellant has committed a violent felony, namely, murder.

The majority candidly acknowledges that grounds exist for "some separate treatment of permanently incompetent criminal defendants formally charged with violent felonies. . . . Allegedly they have engaged in violence so critical that serious criminal charges were believed appropriate." Judicial officers "*have found substantial evidence that the alleged conduct actually was committed as alleged.* Those determinations of probable cause establish strong grounds to believe that, by concrete acts, the incompetent defendants already have seriously imperiled public safety and thus are particularly dangerous." (*Ante,* p. 173, italics added.) Our cases support the majority's thesis that separate legal treatment or classification is appropriate, for equal protection purposes, with respect to mentally ill persons whose criminal propensities have already been judicially determined. (See *In re Moye* (1978) 22 Cal.3d 457, 462 [149 Cal.Rptr. 491, 584 P.2d 1097]; *In re Franklin* (1972) 7 Cal.3d 126, 146 [101 Cal.Rptr. 553, 496 P.2d 465].)

The majority properly rejects the argument that a prior probable cause determination of violent, felonious conduct by a mentally incompetent person should give rise to a "permanent, *conclusive* presumption of continuing dangerousness." (*Ante*, p. 177, italics added.) A probable cause determination lacks that degree of certainty which would warrant such an extreme solution, allowing, as it would, a commitment of unlimited duration. Yet the majority's alternative, requiring proof of dangerousness beyond a reasonable doubt, is equally extreme and unwarranted, ignoring equally grave considerations of public safety.

Given appellant's conceded status as a mentally incompetent person who has previously been adjudged to have probably committed murder, his continued confinement should be upheld by a determination, based upon *the preponderance of the evidence*, that he remains dangerous to himself or others. Such a standard of proof, standing midway between the extremes discussed above, achieves an appropriate balance between the right of appellant to fair and equal treatment under the law, and the right of the general public to protection from persons of demonstrated dangerous propensities.

Clark, J., concurred.

**BIRD, C. J.,** Dissenting.—It is with considerable bewilderment that one reads today's majority opinion. Explicit words—not to mention fundamental premises—of a United States Supreme Court decision are ignored, as if they do not exist. Firmly established methods of equal protection analysis are fleetingly alluded to and then forgotten. Plain truths that this court has heretofore openly embraced are now somehow repealed.

I must respectfully dissent.

## I

The relevant legal history begins in 1966 with the United States Supreme Court's decision in *Baxstrom v. Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760]. Baxstrom was a prisoner serving a sentence for assault who was certified as insane and transferred to an institution for "dangerously mentally ill" persons. As Baxstrom's prison sentence was about to expire, the state sought to have him civilly committed to the same institution. By statute, a civil commitment at the end of a prisoner's term was permitted if the *court* found that the prisoner was

still insane. However, if the state sought to civilly commit any person other than a prisoner whose term was expiring, that person had the right to a *jury* determination of the question of his sanity.

The Supreme Court found that the denial to Baxstrom of the right to jury review of the issue of insanity violated equal protection. In rejecting the state's argument that this disparity in procedure was justified because Baxstrom's conviction and sentence demonstrated his "dangerous or criminal propensities," the high court stated that "there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments." (383 U.S. at pp. 111-112 [15 L.Ed.2d at p. 624].)[1]

Six years after *Baxstrom*, the Supreme Court handed down *Jackson v. Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845], which is the benchmark decision in this area. There, petitioner Jackson stood accused of two robberies but was found incompetent to stand trial on the charges.[2] Pursuant to Indiana statute, Jackson was ordered confined in an "appropriate psychiatric institution" until he became "sane." Since the evidence adduced at Jackson's incompetency hearing established there was "little likelihood of improvement" in his mental condition (see 406 U.S. at p. 723 [32 L.Ed.2d at p. 442]), the incompetency commitment amounted to a confinement for life.

Indiana had two other laws providing for the involuntary commitment of persons on the basis of their mental deficiencies. However,

---

[1]The court also held that Baxstrom had been denied the equal protection of the law in another respect, i.e., "by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he is *dangerously* mentally ill such as that afforded to all so committed except those, like Baxstrom, nearing the expiration of a penal sentence." (*Id.*, at p. 110 [15 L.Ed.2d at p. 623], italics added.)

"The capriciousness of the classification employed by the State is thrown sharply into focus by the fact that the full benefit of a judicial hearing to determine dangerous tendencies is withheld only in the case of civil commitment of one awaiting expiration of penal sentence. A person with a past criminal record is presently entitled to a hearing on the question whether he is dangerously mentally ill so long as he is not in prison at the time civil commitment proceedings are instituted. Given this distinction, all semblance of rationality of the classification, purportedly based upon criminal propensities, disappears." (*Id.*, at p. 115 [15 L.Ed.2d at p. 626].)

[2]Under then-existing state law, an accused person was incompetent to stand trial if he "has not comprehension sufficient to understand the proceedings and make his defense...." (Former Ind. Ann. Stat., § 9-1706a (supp. 1971), quoted at 406 U.S. at pp. 717-718, fn. 1 [32 L.Ed.2d at p. 439].)

the commitment and release standards under these provisions were "substantially different" from those used in criminal incompetency proceedings. (*Id.*, at p. 727 [32 L.Ed.2d at pp. 444-445].) For the "feeble-minded" and the "mentally ill," commitment was more difficult and release easier than for persons adjudged to be incompetent. (*Id.*, at p. 730 [32 L.Ed.2d at p. 446].)

The Supreme Court held in *Jackson* that the state's use of more onerous commitment and release standards against incompetents alone violated equal protection principles. It found that this disparity could not be justified on the basis that alleged incompetents, unlike persons sought to be committed for feeble-mindedness or mental illness generally, were necessarily the subjects of formal criminal charges. "If [as *Baxstrom* had held] criminal conviction and imposition of sentence are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others, the mere filing of criminal charges surely cannot suffice." (406 U.S. at p. 724 [32 L.Ed.2d at p. 443].)

The court discussed in detail the specific question of disparities in release standards for institutionalized persons who were mentally ill. It ruled that a state may not, "without reasonable justification,... apply standards making [an individual's] commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release." (*Id.*, at p. 729 [32 L.Ed.2d at p. 446].) Neither a pending criminal charge nor, indeed, a final criminal conviction would, the court held, supply the "reasonable justification" required by the Constitution for unequal release standards. (*Id.*, at pp. 729-730 [32 L.Ed.2d at p. 446].)

The Supreme Court also held that Jackson's indefinite commitment for incompetency violated due process. (*Id.*, at p. 731 [32 L.Ed.2d at p. 447].) "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." (*Id.*, at p. 738 [32 L.Ed.2d at p. 451].) Jackson was committed for the purpose of enabling him to regain his competence to stand trial, yet the record established that this purpose was not being, and probably never would be, achieved. (See *In re Davis* (1973) 8 Cal.3d 798, 804 [106 Cal.Rptr. 178, 505 P.2d 1018].)

Accordingly, the court adopted a "rule of reasonableness." (*Jackson, supra*, 406 U.S. at p. 733 [32 L.Ed.2d at p. 448].) It held that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." (*Id.*, at p. 738 [32 L.Ed.2d at p. 451], fn. omitted.)

At the time *Jackson* was decided, California, like Indiana, had standards for commitment and release of persons incompetent to stand trial which were "significantly different" from those prescribed for all other persons sought to be civilly committed. (*In re Davis, supra*, 8 Cal.3d at p. 805.) California statutes also authorized the indefinite commitment of persons found to be incompetent. Thus, relying on *Jackson*, this court invalidated those California procedures. (*In re Davis, supra*, 8 Cal.3d 798.)

The Legislature responded to *Jackson* and *Davis* by revising the incompetency laws of this state. (Stats. 1974, ch. 1511, p. 3316 et seq.) As amended, the laws still permit the lifelong institutionalization of an incurably incompetent person accused (but not convicted) of crime. However, the provisions authorizing such a commitment were moved from the Penal Code to the general civil commitment statutes. (The Lanterman-Petris-Short Act [hereinafter, the L.P.S. Act], Welf. & Inst. Code, § 5000 et seq.) Now, an indefinite commitment for incompetency is permitted only if the incompetent person has been indicted or held to answer for "a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person." (Welf. & Inst. Code, § 5008, subd. (h)(2).) Moreover, according to the majority, the incompetent accused person must be *presently* dangerous. (Maj. opn., *ante*, at pp. 174-177.) However, while these revisions may have addressed some of the due process problems identified in *Jackson* and *Davis*, they did not begin to overcome the equal protection deficiencies.

## II

At the heart of this appeal lies appellant's claim that California law, providing for the indefinite commitment of certain incompetent persons accused of crime, denies him the equal protection of the law. The majority recognize that this contention involves a constitutionally fundamental interest and that "strict scrutiny is the correct standard of review." (Maj. opn., *ante*, at p. 171, fn. 8.) This means that the state must (1) establish that it has a *compelling* interest which justifies the law and then (2) demonstrate that the distinctions drawn by the law are *necessary* to further that purpose. (See *People v. Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].)

Two equal protection questions are posed by this appeal. The first involves the state's unequal statutory treatment of incompetent persons as compared to its provisions for other unconvicted persons who are dangerous as a result of mental disorder.[3] (See Welf. & Inst. Code, §§ 5300-5306.) Whereas persons subject to the 90-day postcertification procedures may be committed only for "intensive treatment,"[4] an incompetent individual (appellant herein) may be committed even if no treatment for his condition is available. Moreover, the length of an incompetent's commitment is far greater than that permitted under the 90-day postcertification procedures. An incompetent person may be institutionalized for life; an imminently dangerous person may be committed for only 90 days and his commitment may not be renewed unless he has threatened, attempted, or engaged in violence during the prior 90 days' confinement. (Welf. & Inst. Code, § 5304.)

These vast differences in this state's handling of incompetent persons and imminently dangerous persons are upheld by the majority by means of a process of sophistical reasoning. The incompetency laws are said to serve a compelling state interest, i.e., protection of the public. Therefore, the majority assert, the disparities are justified on the basis that the Legislature could "reasonably" conclude that incompetent persons are presently more dangerous than imminently dangerous persons since the former are "formally charged with" a violent crime and have previously been held to answer for that crime after a judicial determination of probable cause.

---

[3]The provisions for the involuntary commitment of the latter group will be referred to as the "90-day postcertification" procedures, and the persons confined under these provisions as "imminently dangerous."

[4]See Welfare and Institutions Code sections 5300 and 5304.

The compelling nature of the state's interest in protection of the public may be conceded, but the majority's "logic" is fallacious at virtually every other step. At the outset, the mere "reasonableness" of the legislative classification scheme is not the correct constitutional yardstick in this case. (Cf., maj. opn., *ante*, at p. 172.) "[S]trict scrutiny is the correct standard of review" (maj. opn., *ante*, at p. 171, fn. 8), and under the second prong of the strict scrutiny test, this court is required to determine whether the statutory disparities are *necessary* to protect the public. (Cf., *ante*, at p. 189.) Obviously, it is not *necessary* for the protection of the public that nontreatable incompetents be institutionalized whereas imminently dangerous persons who are not treatable remain free; nor is it *necessary* that incompetents remain confined for life while imminently dangerous persons are released after 90 days. To avoid this ineluctable conclusion, the majority simply ignore this prong of the strict scrutiny test and apply the minimal scrutiny of the rational basis test.

Even viewing this case from the viewpoint of mere "reasonableness," the majority's conclusions do not withstand analysis. The reasoning that a judicial determination of probable cause justifies the unequal handling of incompetents is unpersuasive. It is *present* dangerousness that is relevant to the state's compelling interest in protecting the public. As the majority recognize, the validity of the assumption that one who has been charged with a violent felony is *currently* dangerous diminishes with the passage of time. (Cf., maj. opn., *ante*, at p. 177.) The parties to this appeal have informed us that proceedings to permanently commit an incompetent individual under the L.P.S. Act are normally brought at least three years after the commission of the crime charged. (Cf., Pen. Code, § 1370.) By this time, the validity of the state's assumption will have diminished to virtual insignificance. It surely cannot be said to justify the huge discrepancies which California law has created.

The validity of the state's assertion as to the present dangerousness of incompetents is also undermined by the exceptionally limited nature of the "judicial determination of criminal conduct"[5] from which that conclusion is drawn. A judicial determination that an accused should be held to answer for a violent crime is far less reliable as an indicator of his actual commission of that crime than is a conviction, since the state's burden at a preliminary examination is much easier to meet than at trial. This would be true even if the accused were *competent*, but

[5]*Ante*, at page 172.

when he is *incompetent*, the judicial determination of probable cause is even less reliable as an indication that he *in fact* committed a criminal act. "Counsel cannot effectively represent a defendant who is unable to understand the proceedings or to rationally assist him." (*Hale* v. *Superior Court* (1975) 15 Cal.3d 221, 228 [124 Cal.Rptr. 57, 539 P.2d 817].) Thus, when an accused is incompetent at the preliminary hearing, there is at best an extremely limited opportunity for effective cross-examination or presentation of the defense point of view.

In sum, it is wholly unreasonable to conclude that because incompetent persons were held to answer for a violent crime committed some years in the past, they are currently more dangerous to the public than imminently dangerous persons. This profferred justification for the state's enormously disparate treatment of the two groups should be rejected. Indeed, the United States Supreme Court has already explicitly done so. In *Jackson* and *Baxstrom*, it has held that neither the filing of criminal charges *nor the obtaining of a final conviction* are adequate "to justify less procedural and substantive protection against indefinite commitment than that generally available to all others...." (*Jackson, supra,* 406 U.S. at p. 724 [32 L.Ed.2d at p. 443].) If a person's actual conviction is insufficient to justify "apply[ing] standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release" (*id.,* at p. 729 [32 L.Ed.2d at p. 446]), a fortiori the fact that the person has been held to answer is insufficient.

One searches today's majority opinion in vain for some indication that they recognize the meaning of those words by the Supreme Court. The majority "do not regard [*Jackson*] as holding that the fact of criminal incompetency may never be a basis for involuntary confinement prescriptions." (*Ante,* at p. 171.) But that statement is a truism. It does not, however, support the majority's conclusion that California procedures comport with equal protection despite the clear language of *Jackson.* The majority have apparently determined to deal with *Jackson* and *Baxstrom* in the same fashion as they dealt with the second prong of the strict scrutiny test. They treat it as if, having conceded its existence, they can then ignore it.

### III

Even if I were to accept the majority's reasoning that a prior "judicial determination of criminal conduct" is sufficient to uphold the

incompetency laws of this state against an equal protection challenge based on a comparison with the statutes relating to the 90-day postcertification procedures, it would be impossible to uphold the validity of the incompetency laws. It would then become necessary to compare the Legislature's treatment of incompetent persons with its treatment of other persons who have suffered a "judicial determination of criminal conduct."

The majority have identified three groups of such persons: (1) those found not guilty by reason of insanity (Pen. Code, § 1026 et seq.); (2) those found to be mentally disordered sex offenders (Welf. & Inst. Code, § 6300 et seq., hereinafter referred to as MDSO's); and (3) those committed to the California Youth Authority (Welf. & Inst. Code, § 1800 et seq.). Under current law, all of these persons may under specified circumstances be indefinitely confined in an institution as a result of a mental defect.

However, the commitment and release standards for all three of these groups differ significantly from those provided for incompetents. No individual may be committed in the first instance under the procedures mentioned by the majority unless there has been a determination *beyond a reasonable doubt* that he or she is guilty of a crime. In addition, since the purpose of commitment under these three provisions is the *treatment* of the offender's mental condition,[6] the confinements thus authorized must be terminated if treatment is unfeasible or unavailable. (See *Jackson, supra,* 406 U.S. at pp. 731-738 [32 L.Ed.2d at pp. 447-451]; see also, *Gary W., supra,* 5 Cal.3d at p. 302.)

Neither of these substantial protections is accorded to a person subjected to incompetency proceedings in this state. As already noted, incurably incompetent persons may be committed without any proof beyond a reasonable doubt that they committed a felonious act, and they will remain confined even when it is determined that the state cannot treat their mental disorder.[7]

---

[6]*In re Gary W.* (1971) 5 Cal.3d 296, 302 [96 Cal.Rptr. 1, 486 P.2d 1201] [extension of Youth Authority commitment]; *In re Moye* (1978) 22 Cal.3d 457, 466 [149 Cal.Rptr. 491, 584 P.2d 1097] [commitment as an MDSO or as a person found not guilty by reason of insanity].

[7]Incompetent persons accused of violent felonies may be the only individuals in this state who can be institutionalized for life on the basis of a mental defect that the state cannot treat.

This discrimination against incompetents is clearly not "necessary" to safeguard the public since the greater protections are afforded to equally dangerous persons such as MDSO's. The disparity is not even rational. And once again the Supreme Court's prior decisions speak directly to this sort of unequal protection of the laws. Here, just as in *Jackson*, the incompetent individual has been "subject[ed] to a more lenient commitment standard and to a more stringent standard of release than those generally applicable" to all others whom the majority deem to be similarly situated. (See *Jackson, supra*, 406 U.S. at p. 730 [32 L.Ed.2d at p. 446].) "[B]y thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by [the statutes dealing with other persons who have suffered a prior judicial determination of criminal conduct], [California] deprived [appellant] of equal protection of the laws under the Fourteenth Amendment." (*Ibid.*)

## IV

In addition to the equal protection problems discussed above, this case also presents another important but difficult question concerning a government's power to incarcerate its citizens. May an individual be institutionalized—against his will and for the remainder of his life—on the basis of his *status* of having a "dangerous" mental condition where (1) it has not been proved beyond a reasonable doubt that he committed any violent act amounting to a crime and (2) the state cannot treat his mental condition?

This question raises serious issues under our constitutional requirements of due process of law[8] and our prohibitions against cruel and/or unusual punishments.[9] To the extent these issues are considered at all, the majority appear to uphold such involuntary lifetime commitments solely on the basis of the state's "compelling interest[ ] in public safety." (Maj. opn., *ante*, at p. 171.) But the reasons underlying their conclusion are difficult to discern. No potentially counterbalancing considerations are even discussed. The state's interest in public safety would seem to be equally strong with respect to "imminently dangerous" persons, yet it

---

[8]See *Jackson, supra*, 406 U.S. at pages 736-738 [32 L.Ed.2d at pages 449-451]. Compare, United States Constitution, Fifth and Fourteenth Amendments; California Constitution, article I, sections 1 and 7.

[9]See *Robinson v. California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417]. Compare, United States Constitution, Eighth Amendment; California Constitution, article I, section 17.

is not suggested—and I doubt every member of today's majority would accept—that a person who has committed no crime may be "hospitalized" for life on the basis that some authority thinks he has an incurable mental defect which will result in future harm to society.

Perhaps an understanding of the majority's conclusions can be gleaned from its discussion of the ex post facto question raised by appellant. There, the majority reveal that they regard appellant's confinement as "not penal" in nature and as imposing no "punishment." (Maj. opn., *ante*, at p. 182.)

These designations of appellant's confinement are incredible. Incurably incompetent persons such as appellant are generally kept in institutions like Patton or Atascadero State Hospitals. This court has repeatedly recognized that these institutions do not differ appreciably from prisons.[10] Within those same walls are persons convicted of and serving sentences for crime. Moreover, appellant's commitment to these institutions is for the rest of his life. He is confined against his will. He is confined only because there has been a "judicial determination of criminal conduct." He receives no treatment. The sole justification for his confinement is the protection of society, which this court has explicitly declared is a "well-known purpose of *punishment*." (*People v. Feagley* (1975) 14 Cal.3d 338, 376 [121 Cal.Rptr. 509, 535 P.2d 373], italics added.) Under these circumstances, to conclude, as the majority do, that appellant's extended confinement is not punishment is to exalt form over substance.

## V

Since in my view the judgment against appellant was obtained in violation of the constitutional provisions regarding equal protection, due process, and cruel and/or unusual punishment, I would reverse.

Appellant's petition for a rehearing was denied October 15, 1980. Bird, C. J., was of the opinion that the petition should be granted.

---

[10]See *People v. Burnick* (1975) 14 Cal.3d 306, 319-320 [121 Cal.Rptr. 488, 535 P.2d 352]; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 226-227 [152 Cal.Rptr. 425, 590 P.2d 1].