Filed 2/24/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROSALINDA C.,<br><br>     Defendant and Appellant. | A138128<br><br>(Alameda County Super. Ct.<br> No. RM08378235) |

Rosalinda C.[1] appeals from an order committing her as a mentally retarded person who is a danger to herself and others to California Psychiatric Transitions, a locked facility, for one year. (Welf. & Inst. Code, § 6500.)[2] Pursuant to legislation passed in 2012, if Rosalinda's first commitment hearing had been held on or after July 1, 2012, she could not have been committed for more than six months initially, and then only if the court found her to be dangerous and in "acute crisis." (§§ 6500, subd. (c)(2), 4418.7, subd. (d)(1).) Rosalinda argues that the disparate treatment of mentally retarded committees based solely on the date of their first commitment violates the equal protection clause. Rosalinda also challenges the evidentiary basis of the court's findings that her mental retardation caused her to have serious difficulty controlling her dangerous

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and III.

[1] We grant Rosalinda's request to omit her surname in order to protect the confidentiality of her mental history. (Welf. & Inst. Code, § 5328.) To further assure confidentiality, we also omit her mother's surname.

[2] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

1

behavior; and that a locked facility was the least restrictive appropriate placement. We affirm.

## STATEMENT OF THE CASE

Rosalinda was first admitted to California Psychiatric Transitions (CPT) under a section 6500 commitment in 2008. She was recommitted pursuant to section 6500 for one year from November 15, 2011 to November 15, 2012. On November 13, 2012, the Alameda County District Attorney's Office filed the current petition alleging that Rosalinda C. is mentally retarded and a danger to herself and others, and requesting renewal of her involuntary commitment to the State Department of Developmental Services for residential placement for an additional year. (Welf. & Inst. Code, § 6500.) Rosalinda was ordered to be held at CPT, her existing placement, until the hearing on the petition.

Rosalinda opposed the extension of her commitment. The court heard and denied Rosalinda's motion to dismiss the petition on equal protection grounds. On February 28, 2013, following a hearing at which four witnesses testified, the court granted the petition and committed Rosalinda to CPT for suitable treatment and rehabilitation for one year, until November 15, 2013.

## STATEMENT OF FACTS

Dr. Scott Turpin, M.D., was Rosalinda's attending psychiatrist at CPT from November 2011 through September 2012. In preparation for his testimony, Dr. Turpin reviewed Rosalinda's CPT medical record.

Rosalinda was in the main unit at CPT from March 2011 to September 2012, when she was moved into the Disruptive Behavior Unit because of her assaultive behavior and some other problems in the main unit. A different psychiatrist was in charge of the Disruptive Behavior Unit and he made the final decision, in collaboration with the attending psychiatrist and others, whether a patient was ready to be moved out of the Disruptive Behavior Unit. So far, Rosalinda had not gained sufficient control of her assaultive behavior to allow for her transfer back to the main unit.

2

Based on medical record review, consultation with treatment team members, and observation, in November 2011 Dr. Turpin diagnosed Rosalinda with schizophrenia, paranoid type. Schizophrenia is characterized by "positive" symptoms which respond to treatment, such as auditory and sometimes visual hallucinations, fixed false beliefs, and significant disorganization of speech and thought. It is also characterized by "negative" symptoms which do not respond to treatment, such as lack of sociability, lack of motivation, and flat emotional expression. When Dr. Turpin first began interacting with Rosalinda, he did not observe symptoms of paranoid schizophrenia. His assessment was that Rosalinda had been on antipsychotic treatment for some time and at least the positive symptoms of her disease were under control.

Based on review of her records, Dr. Turpin also diagnosed her with mild mental retardation, of which she has a long-standing history. "Her presentation appeared consistent with that, even simple mental status questions were consistent with low IQ." In general, mentally retarded people can exhibit immature coping skills, poor impulse control, and difficulty managing their behavior, and in November 2011 when Dr. Turpin first came in contact with her, Rosalinda exhibited all of those traits.

By September and October of 2012, Dr. Turpin was getting frequent calls from staff who reported that Rosalinda had hit other patients. She was unable to explain why she was hitting peers. Occasionally, staff reported that she hit them. This was a change in Rosalinda's prior behavior and it seemed to be getting worse. Most recently, Rosalinda reported that she struck two people the week before the court hearing, and staff notes corroborated a recent incident of pushing and an attempt to strike another patient on February 20, 2013. No one had suffered significant injury as a result of being hit by Rosalinda.

In Dr. Turpin's opinion, Rosalinda currently has difficulty managing her assaultive behavior because of her developmental delay, not her schizophrenia. His opinion was based on the fact that in the past, Rosalinda had said she "struck because she heard voices telling her to do that," but not recently. In fact, she currently denied auditory hallucinations or delusions. Dr. Turpin had not observed any symptoms of schizophrenia

at the time her assaultive behavior began to escalate.  At times, Dr. Turpin considered whether Rosalinda's failure to respond to staff or to him and her tendency to "just sort of [stare]" was a symptom of schizophrenia called thought blocking, but he opined it was also possible "she could be choosing just not to respond."

In addition to assaultive behavior, Rosalinda had recently begun to exhibit other symptoms indicating poor impulse control, such as urinating on herself on purpose in order to achieve other ends, like avoiding group therapy, and ensuring she was the last in line for medication or meals.  Rosalinda was digging in the trash to look for food, and she sometimes ate out of the trash.  In 2008, when she came into CPT, she weighed over 300 pounds.  Since then, she has been on a restricted-calorie diet and has lost significant weight.  Although the trash-digging behavior might be motivated by hunger, Dr. Turpin had tried other ways to help hungry patients, such as encouraging them to drink water, or giving them extra portions of vegetables.

Also, Rosalinda had been throwing tantrums which involved yelling and tossing chairs.  The increase in the frequency of this conduct caused Rosalinda to be removed from the main unit and placed in the Disruptive Behavior Unit.  At the time of trial, this behavior had begun to lessen.

At the time of trial, Rosalinda was taking several psychiatric medications regularly:  50 milligrams of clozapine twice a day and 400 milligrams at night; 60 milligrams of a generic Prozac (fluoxetine) in the morning; and one-half milligram of generic Ativan (lorazepam), an anti-anxiety medication, twice a day.  She also received additional lorazepam and Thorazine, an older antipsychotic drug, on an as-needed basis. Dr. Turpin increased Rosalinda's clozapine dosage in February 2012 in the hope that the drug's anti-impulsivity and anti-aggression effects would ease Rosalinda's difficulty with impulse control during the day, even though her impulsivity and aggression were the result of her mental retardation.  Rosalinda's aggressive behavior did seem to improve for a while before things got worse again in June 2012.  On July 3, 2012, Rosalinda reported she had "not heard voices in about a week," and Dr. Turpin "didn't see anything that was suspicious of auditory hallucinations at that point."

4

Rosalinda also engaged in self-injuring behavior. In late August or early September 2012, Rosalinda sustained a minor injury to her thumb, which became infected. By the time Rosalinda brought her injured thumb to anyone's attention, it had become so infected she had to be hospitalized for several weeks; her thumb was almost amputated. In the Disruptive Behavior Unit, which had only 12 patients, there was a better staff-to-patient ratio than in the main unit, generating better supervision.

In Dr. Turpin's opinion, Rosalinda was a danger to herself because she had a history of making suicidal threats. She often threatened to kill herself in an attempt to manipulate caregivers or her placement situation. However, on February 14, 2013 she was found with a six-foot strip of cloth, a few inches wide, that appeared to have been taken from a bedsheet. She said it was an accident—"the sheet had just ripped"—but Dr. Turpin found the incident worrisome.

It was also his opinion that Rosalinda was a danger to others "because of the repetitive hitting at other people, pushing people." He further opined that Rosalinda had trouble controlling her dangerous behavior because of her mental retardation. He arrived at this opinion because he had "not observed symptoms of schizophrenia, the auditory delusion or disorganized thinking, so it seems more consistent with poor impulse control associated with her mental retardation."

Jeffrey Nagafuji is a case management supervisor at the Regional Center of the East Bay (the Regional Center). Rosalinda's case was transferred to Nagafuji's team in 2008, shortly after she was placed at CPT. Before placement at CPT, she had been in a number of care home facilities on a short-term basis, and before that, in 2007, she lived with her family. Rosalinda's mother requested Rosalinda be placed in a group home.

The Regional Center tries to place a client in the least restrictive placement permitted by the client's behavioral needs and disorders. In Rosalinda's case, it became apparent that such placements prior to her move to CPT were not satisfying her mental health and behavioral needs; a higher level of care was indicated.

The appropriateness of Rosalinda's placement is reviewed on a quarterly basis. The last review involving Nagafuji occurred in August 2012. At that time, CPT appeared

to be the most appropriate placement for Rosalinda, given her mental health and behavioral needs. CPT provides close mental health monitoring and the provision of psychiatric services on site. These services were not available at a less restrictive placement. Also, unlocked facilities might not be able to adequately address some aggressive behaviors. As of the time of trial, there was no board-and-care facility the Regional Center considered able to meet all of Rosalinda's diverse needs as well as CPT did.

As of August 2012, returning Rosalinda to her mother's home was not a realistic option, given Rosalinda's continued aggressive behavior at CPT. In addition, the Regional Center staff were concerned about suicide risk and medication compliance issues if Rosalinda were to be returned to her mother's home. Previously, Rosalinda's placement with her mother had proven inadequate precisely because Rosalinda did not take her medications, used alcohol, and displayed aggression while at home. It appeared to Nagafuji that Rosalinda continued to need a higher level of care than could be provided at home. He drafted a report requesting that Rosalinda be recommitted to CPT pursuant to Welfare and Institutions Code section 6500. If Rosalinda were able to display stability for a substantial period of time, the Regional Center staff would consider transitioning her to a lower level of care such as a board-and-care or group home placement. To date, Rosalinda had not been able to do that.

A.C. is Rosalinda's adoptive mother and biological aunt. Rosalinda lived with A.C. from age two and a half until age 18, when she went to live in a group home at A.C.'s request. At the time, individual doctors were giving Rosalinda different medications and no one was really monitoring them. As a result, Rosalinda began to throw loud tantrums. Rosalinda did not improve while she was in group or board-and-care homes, but A.C. noticed an improvement since Rosalinda was at CPT. Rosalinda appeared calmer and more alert, more like the laughing, talkative, happy person she used to be.

A.C. now very much wanted Rosalinda to return home because she missed Rosalinda. Her plan for caring for Rosalinda at home included getting a psychiatrist for

6

her. Since A.C. worked five days a week from 11:00 p.m. to 7:00 a.m., other relatives would help care for Rosalinda. A.C. planned to send Rosalinda to Fremont Adult School to learn independent living skills. School lasted from 9:00 a.m. to 2:30 p.m., Monday through Thursday. A.C. would "make sure" Rosalinda takes her medications. She was not afraid of being assaulted by Rosalinda; Rosalinda had never been physically aggressive to her. If Rosalinda threw a tantrum at home, she would take a walk with Rosalinda, because that used to help her "a lot," and she would have Rosalinda play with her dogs. A.C. would manage Rosalinda's incontinence by having someone take Rosalinda to the bathroom every three hours and have Rosalinda drink a bit more during the day and less at night. If Rosalinda started swatting or hitting people, A.C. would try to calm her down by talking to her.

Rosalinda testified on her own behalf. Given a choice, Rosalinda would prefer to live with A.C. She missed her family and her dogs. If she became agitated, Rosalinda would ask her mother for the medication she used on an "as needed" basis, or go on a walk. Rosalinda explained that she hurt her thumb when another girl assaulted her. Staff saw the incident, pulled the girl away, and cleaned her thumb. The next night, Rosalinda had a fever when staff took her vitals and she went to the hospital.

Rosalinda testified regarding the bedsheet incident. The bedsheet tore partway when it got caught in her thumb and Rosalinda pulled the sheet. She ripped the sheet the rest of the way for "fun." She did not plan to hang herself with the sheet.

Rosalinda never physically hurts anybody; she just taps or swats them. She behaves this way because she dislikes CPT; she wants to be home and get her freedom back. Also, she sees that other people get attention for hitting others, and she is jealous of them. She does not hit to get attention; she just hits when she gets mad at others sometimes. Lately, she has been trying to stop herself from hitting and it has been working, although she still hits people.

At CPT, she copycatted someone else who was digging in the trash. She also digs through the trash because she is hungry from being on a low-calorie diet. She knows

7

there are other things she can do instead of digging through the trash, such as asking for fruits and vegetables. She has tried to stop going into the trash, but she still does it.

She feels considerable anxiety during the day. She often feels anxious before she hits people and before she goes into the trash. Taking her "as needed" medicine always calms her down. If she cannot get her medications, she tries alternatives like walking, talking to staff or listening to music.

## DISCUSSION

### I. Mootness

Rosalinda's one-year commitment terminated by operation of law on November 15, 2013. Thus, her appeal is technically moot. Nevertheless, we have the discretion to decide a moot appeal when it presents an important question of law that is likely to evade review and is properly presented by the parties. (*People v. Barrett* (2012) 54 Cal.4th 1081, 1092, fn. 7 (*Barrett*); *In re O.P.* (2012) 207 Cal.App.4th 924, 927.) Rosalinda's equal protection challenge to the 2012 revisions of section 6500 presents such an issue. In light of her history of serial commitment extensions, we also exercise our discretion to review her substantial evidence claims which do not present new or important questions of law, but tend to be recurring issues that can repeatedly evade review. (*People v. Quinn* (2001) 86 Cal.App.4th 1290, 1293.)

### II. Equal Protection of the Law

Rosalinda argues that revisions to section 6500 made in 2012, when her commitment was extended, deny her equal protection under the law. She is correct that after June 27, 2012, there are some developmentally disabled persons who are committed under section 6500 only for six months and only if they are found to be both dangerous and in "acute crisis." Yet, all persons who were first committed before that date remain subject to a one-year commitment based on findings of mental retardation and dangerousness only. As we shall explain, we accept for the purposes of Rosalinda's argument that the two groups are "similarly situated," but we find a rational basis for the statutory distinction. Before turning to our analysis, we briefly review the statutory revisions and the extant legislative history.

8

*The Statutory Revisions*

Prior to June 27, 2012, section 6500 provided that effective July 1, 1971, "no mentally retarded person may be committed to the State Department of Developmental Services . . . unless he or she is a danger to himself or herself, or others." A commitment order made pursuant to section 6500 et seq. expired automatically one year later, but "subsequent petitions for additional periods of commitment" were permitted. Any subsequent petitions were subject to the same procedures as the initial petition for commitment. (Stats. 2010, ch. 178, § 102, eff. Jan. 1, 2012 to June 26, 2012.)

In 2012, section 6500 was amended to read: "A person with a *developmental disability* shall not be committed to the State Department of Developmental Services pursuant to this article unless he or she is a person described in paragraph (2) . . . of subdivision (a) of Section 7505 *and is dangerous to self or others*." (§ 6500, subd. (b)(1), italics added, as amended by Stats. 2012, ch. 25, § 19, eff. June 27, 2012.) The term "developmental disability" includes mental retardation, among other conditions. (§§ 6500, subd. (a)(2), 4512, subd. (a).)

Section 7505 refers in subdivision (a)(2) to persons committed by a court to Fairview Developmental Center "due to an acute crisis" as defined in section 4418.7.[3] An order of commitment made with respect to a person who meets the criteria of sections 6500 and 7505, subdivision (a)(2) expires "automatically six months after the earlier of the order of commitment pursuant to this section or the order of a placement in a developmental center pursuant to Section 6506, unless the regional center, prior to the

---

[3] Section 4418.7 provides in relevant part: "For purposes of this section, an 'acute crisis' means a situation in which the consumer meets the criteria of Section 6500 and, as a result of the consumer's behavior, all of the following are met:  [¶] (A) There is imminent risk for substantial harm to self or others.  [¶] (B) The service and support needs of the consumer cannot be met in the community, including with supplemental services as set forth in subparagraph (E) of paragraph (9) of subdivision (a) of Section 4648 and emergency and crisis intervention services as set forth in paragraph (10) of subdivision (a) of Section 4648.  [¶] (C) Due to serious and potentially life-threatening conditions, the consumer requires a more restrictive environment for crisis stabilization." (§ 4418.7, subd. (d)(1).)

9

expiration of the order of commitment, notifies the court in writing of the need for an extension." An extension, if granted, cannot extend the total commitment time beyond one year. For good cause, the court may grant one further extension for up to 30 days. (§ 6500, subd. (c)(2).)

Section 6500 was amended again in 2012. For our purposes, it is essentially identical to the prior version of section 6500 except it states a third category of persons may be committed to the State Department of Developmental Services under subdivision (b)(1): a person who "currently is a resident of a state developmental center or state-operated community facility pursuant to an order of commitment made pursuant to this article prior to July 1, 2012, and is being recommitted pursuant to paragraph (3) of this subdivision." Paragraph (3) provides: "In the event subsequent petitions are filed with respect to a resident of a state developmental center or a state-operated community facility committed prior to July 1, 2012, the procedures followed and criteria for recommitment shall be the same as with the initial petition for commitment." (§ 6500, as amended by Stats. 2012, ch. 439, § 21, eff. Sept. 22, 2012.)[4]

*Legislative History*

The extant legislative history of revisions to section 6500 in 2012 makes clear that Assembly Bill No. 1472 was introduced by the Assembly Budget Committee to deal with "lower than anticipated revenue projections" and expected cuts of $200 million to the 2012–2013 budget for the Department of Developmental Services. Ninety-nine percent of the consumers served by that department received community-based services while living on the outside. Yet, approximately "1,800 individuals reside in four state-operated DCs [state-run developmental center institutions] and one state-operated community facility. Consistent with national trends that support integrated services and reduced reliance on state institutions, California has been reducing its use of DCs as a placement

---

[4] Effective June 27, 2013, section 6500 was amended once again to clarify that a person with a developmental disability who is found to be a danger to herself or others may be committed to the State Department of Developmental Services for residential placement less restrictive than a state developmental center or state-operated community facility. (§ 6500, subd. (b)(1)(A) & (B), as amended by Stats. 2013, ch. 25, § 11.)

10

for individuals with developmental disabilities for several decades." Among the several "policy changes necessary to implement the projected budget reduction," the bill included provisions restricting admission to DCs while at the same time expanding "the availability of adult residential facilities for persons with special health care needs to consumers of any regional center moving from a DC." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1472 (2011–2012 Reg. Sess.) as amended June 13, 2012, pp. 1–4.)

Assembly Bill No. 1471 recognized Assembly Bill No. 1472 created "new restrictions on admissions to Developmental Centers." However, the Legislature decided the admission and recommitment criteria applicable to individuals committed before the 2012 amendments would still apply to the preamendment group. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1471 (2011–2012 Reg. Sess.) as amended Aug. 24, 2012, p. 3.) The amendments in the bill were "technical, non-substantive, and clean-up in nature." (Assem. Budget Com., Conc. in Sen. Amends. to Assem. Bill No. 1471 (2011–2012 Reg. Sess.) as amended Aug. 24, 2012, p. 2.)

*Equal Protection*

Our courts have often assessed an equal protection challenge in the context of a prospective sentencing change that results in the imposition of different consequences on particular offenders for the same conduct based on when the offense took place. Although we recognize that treatment under a civil commitment scheme is not equivalent to punishment for a crime, we find the analogy instructive. For example, in *People v. Floyd* (2003) 31 Cal.4th 179 (*Floyd*), the defendant argued that the passage of Proposition 36 created two groups of similarly situated nonviolent drug offenders—those convicted before July 1, 2001 whose judgments were not yet final, and those convicted after July 1, 2001—and by denying the first group access to court-supervised treatment instead of jail, the law violated equal protection. In reviewing this argument, our Supreme Court noted "[n]umerous courts . . . have rejected such a claim—including this court." (*Id.* at p. 188.) "A refusal to apply a statute retroactively does not violate the

11

Fourteenth Amendment." (*People v. Aranda* (1965) 63 Cal.2d 518, 532, superseded by statute on another point as stated in *People v. Homick* (2012) 55 Cal.4th 816, 874; see also *Baker v. Superior Court* (1984) 35 Cal.3d 663, 668 (*Baker*).) "The Legislature properly may specify that such statutes are prospective only, to assure that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written." (*In re Kapperman* (1974) 11 Cal.3d 542, 546.) Retroactive application of a punishment-mitigating statute is not a question of constitutional right, but of legislative intent. (*People v. Henderson* (1980) 107 Cal.App.3d 475, 488.) " 'Nothing . . . suggests that the equal protection clause prohibits the Legislature from creating or abolishing a treatment program prospectively.' " (*Floyd*, *supra*, 31 Cal.4th at p. 191, quoting *Baker*, *supra*, 35 Cal.3d at p. 669.)

Therefore, the legislative decision to alter or change a sentencing scheme based on that branch's determination that a modification is appropriate is recognized in the above cases along with the prerogative to set a calendar date for the commencement of that "new" scheme. It has happened with the passage of Proposition 36, as well as the recent 2011 Public Safety Realignment Act (Realignment Act). (*People v. Lynch* (2012) 209 Cal.App.4th 353, 359 (*Lynch*).) It seems equally reasonable to accept this legal principle when considering civil commitment schemes such as Welfare and Institutions Code section 6500 et seq. (See *Baker*, *supra*, 35 Cal.3d at pp. 668–669 [prospective repeal of the mentally disordered sex offender (MDSO) law is constitutional].) " '[T]he Fourteenth Amendment does not forbid statutes or statutory changes to have a beginning and thus to discriminate between the rights of an earlier and later time.' " (*Baker*, *supra*, 35 Cal.3d at p. 669, quoting *Sperry & Hutchinson Co. v. Rhodes* (1911) 220 U.S. 502, 505; see also *Lynch*, *supra*, 209 Cal.App.4th at p. 359 [prospective application of Realignment Act is constitutional].)

We assume for the sake of Rosalinda's argument that individuals subject to commitment under section 6500, on either side of the July 1, 2012 divide, are similarly situated to each other for the purpose of the law, which, as we see it, is to isolate for public safety reasons and to treat humanely and cost-effectively those developmentally

12

disabled persons who are dangerous to themselves or others. (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 172, citing *Baxstrom v. Herold* (1966) 383 U.S. 107, 111; *In re Gary W.* (1971) 5 Cal.3d 296, 304.)

Statutory classifications that treat similarly situated mentally retarded persons differently with respect to issues affecting their civil commitments are evaluated using rational basis review. (*Barrett*, *supra*, 54 Cal.4th at p. 1111, fn. 21; *Heller v. Doe* (1993) 509 U.S. 312, 319–321 (*Heller*).) In *Heller*, the United States Supreme Court used rational basis review to uphold Kentucky's use of a clear and convincing standard of proof to commit the mentally retarded and a reasonable doubt standard of proof to commit the mentally ill. Under rational basis review, "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' [Citations.] [¶] A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.' [Citations.] A statute is presumed constitutional . . . and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' [citation] whether or not the basis has a foundation in the record." (*Heller*, *supra*, 509 U.S. at pp. 319–321.)

In view of the principles discussed above, and applying rational basis review to the issue before us, we have no difficulty finding constitutional the new statutory scheme envisioned by the prospective 2012 revisions to section 6500. The legislative prerogative to change the law prospectively is no different with respect to experimental treatment protocols than with experimental sentencing schemes. "Equal protection considerations will not preclude the legislative branch from prescribing experimental programs." (*McGlothlen v. Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1021.) The Legislature has a rational interest in "limiting the potential costs of its experiment," and prospective application is reasonably related to this goal. (*Lynch*, *supra*, 209 Cal.App.4th at p. 361.)

13

The changes to the criteria for and duration of commitments under section 6500 are no less significant a legislative experiment than the prospective application of the Realignment Act upheld in *Lynch* or the prospective repeal of the MDSO laws upheld in *Baker*, *supra*, 35 Cal.3d 663. As the extant legislative history of section 6500 and its companion statutes (e.g., §§ 7505, 4418.7) make clear, the Legislature has concluded that more cost-effective ways must be found to isolate, yet humanely treat, developmentally disabled persons who pose a danger to themselves or others. Going forward, it has determined to invest in community-based placement and services over regional center-based placements for the treatment and isolation of the dangerous developmentally disabled.

In our view, *Baker* presents a close analogue to this case and assists our analysis. In *Baker,* our Supreme Court found "[n]o significant constitutional problem [] presented by the prospective repeal of the MDSO laws. . . . [¶] Legislation almost inevitably creates some disparities and the differential results which follow the termination of the MDSO program appear no different than those which inevitably accompany either the establishment or elimination of any statutory treatment program. . . . [¶] [T]he Legislature decided in 1981 that the MDSO program was not sufficiently successful to warrant continuation; it therefore provided that no one convicted after the enactment became effective should be committed to the MDSO program. As to those persons 'other enactments . . . would yield prison terms which would provide . . . protection to society. . . .' (Stats. 1981, ch. 928, § 3.) [Fn. omitted.] At the same time, the Legislature decided that the program should not be ended for those persons already committed as MDSO's, apparently concluding that it would be inimical to the public safety simply to end the program altogether, resulting in the release of many still dangerous persons. [¶] When the Legislature eliminated the MDSO program, petitioners had already been committed and were serving their initial term imposed pursuant to section 6316.1; they all faced the possibility of an extension if, at the end of the maximum term prescribed for the sex offense, they met the criteria of section 6316.2. The repeal of the MDSO law did not affect the commitment which had been imposed in lieu of criminal sanctions; the

14

commitment did not become more onerous than it had been. Petitioners were and still are entitled to release when no longer dangerous regardless of the period of confinement for the analogous prison term now specified for the offenses. Stripped to its essentials, petitioners' claim challenges the basic validity of all prospective lawmaking." (*Baker*, *supra*, 35 Cal.3d at pp. 668–670.)

Likewise, in this case, the legislative decision to implement prospectively community-based treatment programs for dangerous developmentally disabled persons has inevitably created some disparities between prior committees and new ones. As with the former MDSO committees, the Legislature has decided to proceed cautiously with respect to the release of developmentally disabled persons who have already been adjudicated to be dangerous to themselves or others and judicially placed in regional center facilities. That decision is neither irrational nor unconstitutional. "[A]n equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. [Citation.] Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' [Citation.] Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination." (*Barrett*, *supra*, 54 Cal.4th at p. 1110.) We hold no equal protection violation has occurred here.

### III.  Substantial Evidence

Rosalinda attacks the order recommitting her to CPT as lacking substantial evidence that (1) mental retardation is the cause of her serious difficulty controlling dangerous behavior, and (2) a locked facility is the least restrictive appropriate placement. For the reasons stated below, we conclude substantial evidence supports the court's order.

In reviewing the sufficiency of the evidence to support an involuntary commitment under Welfare and Institutions Code section 6500, we apply the same standard we use to review the sufficiency of the evidence to support a criminal conviction and other types of involuntary commitments. (*People v. Mercer* (1999) 70 Cal.App.4th

15

463, 466.) "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260–261, italics omitted.) We, therefore, view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577.)

### A. Dangerousness Finding

Rosalinda first asserts that the evidence is lacking because Dr. Turpin "did not explain the nature of the mental retardation and why it made [her] unable to control dangerous behavior." Further, "[h]e was unable to say whether it was the mental retardation or the schizophrenia that caused the behavior." And finally, Rosalinda argues that while there was evidence she *did not* control her behavior, there was no evidence that she "*tried* to control [her] behavior, that [she] encountered *serious difficulty* when trying to do so, or that [her] difficulty was *caused* by [her] mental condition." (*People v. Galindo* (2006) 142 Cal.App.4th 531, 539.) We disagree.

To be sufficient, the evidence need not demonstrate that mental retardation *caused* the dangerous behavior. (*People v. Quinn*, *supra*, 86 Cal.App.4th at p. 1293.) On the other hand, it must support a finding by the trier of fact that mental retardation was a *substantial factor* in causing her serious difficulty in controlling her dangerous behavior. (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 97 (*Cuevas*); *In re O.P.*, *supra*, 207 Cal.App.4th at pp. 930–931; *People v. Sweeney* (2009) 175 Cal.App.4th 210, 225.)

16

Here, expert testimony on Rosalinda's specific IQ score or mental age[5] was not necessary to support the requisite finding because the parties did not dispute the diagnosis of mild mental retardation. Dr. Turpin explained that in general, mentally retarded people tend to exhibit immature coping skills, poor impulse control, and difficulty managing their behavior. Rosalinda's presentation was consistent with her long-standing history of mild mental retardation, and she exhibited the immaturity of coping skills, poor impulse control, and difficulty managing her behavior characteristic of a person with mental retardation. Specifically, Dr. Turpin testified that in his opinion, Rosalinda was a danger to others "because of the repetitive hitting at other people, pushing people," and that Rosalinda had serious difficulty controlling that behavior because of her mental retardation.

The situation in *Cuevas*, *supra*, 213 Cal.App.4th 94 is factually distinguishable from Rosalinda's situation here. In *Cuevas*, "the evidence introduced at trial strongly suggested that Ronald's dangerous behavior was attributable almost entirely to his mental illness (i.e., psychosis), and not his mental retardation." (*Id.* at p. 107.) That simply is not the case here. Dr. Turpin concluded that Rosalinda's lack of self-control was more attributable to her mental retardation than her mental illness because he had "not observed symptoms of schizophrenia, the auditory delusion or disorganized thinking, so it seems more consistent with poor impulse control associated with her mental retardation." His opinion in this regard was supported by his extensive testimony about his observations of Rosalinda since 2011, his efforts to ameliorate her aggressive and ritualistic behaviors by increasing the dosages of her antipsychotic medications, and the apparent failure of those efforts to help Rosalinda control those behaviors after a brief respite from them in February 2013. Furthermore, he testified that at one time, Rosalinda

---

[5] "The AAMR [American Association on Mental Retardation] guidelines specify four different degrees of mental retardation, from mild to profound. According to that classification system, an adult with an IQ between 50 and 70 is deemed to have 'mild' mental retardation. [Citations.] . . . Mild mental retardation in adults is equivalent to a 'mental age from 9 to under 12 years.' [Citation.]" (*Barrett*, *supra*, 54 Cal.4th at pp. 1114, 1130 (conc. & dis. opn. of Liu, J.).)

had attributed her behavior to "voices telling her to do that," but that she no longer did so. In short, even though Dr. Turpin had "not observed symptoms of schizophrenia," Rosalinda continued to engage in aggressive behavior, although she could not explain to him what motivated her to do so. In our view, Dr. Turpin's testimony provided sufficient basis for the court to confidently conclude that Rosalinda's mental retardation was a substantial factor in causing her serious difficulty controlling her dangerous behavior, and that her dangerous behavior was not attributable solely to her mental illness.

Additionally, the record supports the conclusion that Rosalinda's conduct was not "volitional." In addition to Dr. Turpin's expert testimony that Rosalinda had difficulty managing her aggressive behavior, Rosalinda's own testimony demonstrated that she had great difficulty controlling herself. For example, she admitted that lately she had been trying to stop herself from hitting and sometimes succeeded, but she still hit people. Similarly, she knew she could eat more fruits and vegetables instead of digging in the trash for food, and she had tried to stop going into the trash can, but she still did it. The evidence was sufficient in this regard.

Finally, in our view, the evidence indicating that Rosalinda threw chairs and hit both peers and staff was sufficient to support a finding that Rosalinda posed a danger to public health and safety. To be sufficient in this regard, the evidence must show the person's conduct has "the potential for infliction of substantial harm upon [herself] or upon others." (*People v. Alvas* (1990) 221 Cal.App.3d 1459, 1467, disapproved on other grounds in *Barrett*, *supra*, 54 Cal.4th at p. 1106; see also *People v. Hartshorn* (2012) 202 Cal.App.4th 1145, 1154 [conduct presents a likelihood of serious physical injury to self or others].) Although her behavior had not *yet* caused any injury, the trial court was entitled to infer from the evidence there was a very real likelihood or potential that if unchecked Rosalinda's assaultive behavior would eventually result in physical injury to herself or others and, therefore, posed a danger to public safety.

## B. Least Restrictive Appropriate Placement

Welfare and Institutions Code section 6506 provides in relevant part: "Prior to the issuance of an order under this section, the regional center and developmental center, if

18

applicable, shall recommend to the court a suitable person or facility to care for the person alleged to have a developmental disability.  The determination of a suitable person or facility shall be *the least restrictive option* that provides for the person's treatment needs and that has existing security systems or measures in place to adequately protect the public safety from any known dangers posed by the person." (Italics added.)  "There is a [statutory] preference for the least restrictive environment provided that 'public safety' will not be compromised." (*People v. Quinn*, *supra*, 86 Cal.App.4th at p. 1295.)

Rosalinda argues the evidence is insufficient to support a finding that CPT, a locked facility, is the least restrictive placement option for her.  She further argues, "[t]he evidence as to placement comes entirely from Jeffrey Nagafuji," and she takes issue with Mr. Nagafuji's testimony because he is not an expert and has no licenses.  She claims his testimony was conclusory and lacked particulars.  She alleges he rejected board-and-care home placement "not necessarily because it would not be appropriate, but merely because there were no vacancies at present."[6]  We disagree.

Mr. Nagafuji testified as the case management supervisor at the Regional Center. As such, he was in charge of the Regional Center team tasked with finding the most appropriate placement for Rosalinda, given her particular mental health and behavioral needs.  He did not need to be an expert, or possess any particular licenses, to testify about his efforts or his team's efforts to find Rosalinda an appropriate placement.  He knew that

---

[6] Rosalinda also complains that Mr. Nagafuji's report was full of hearsay about her aggressive behavior and should not have been admitted into evidence over objection. Inasmuch as we have not considered the contents of the report in connection with Rosalinda's evidentiary insufficiency arguments, we decline to rule on its admissibility. However, "where a section 6500 petition is filed, the trial court is entitled to a written report prepared by, or at the behest of, the director of the regional center, following an examination of the alleged mentally retarded person.  (§ 6504.5.)  Regional centers specialize in assessing and assisting mentally retarded and other developmentally disabled persons on an individual basis.  [Citation.]  Thus, the regional center report obviously serves as a professional pretrial evaluation of the person's history, condition, and behavior, and includes informed recommendations on treatment and placement, including any interim placement pending the hearing." (*Barrett*, *supra*, 54 Cal.4th at p. 1104.)

prior to her placement at CPT, Rosalinda had lived at home and in a number of care home facilities. These placements did not work out. The existing supports were not meeting her mental health and behavioral needs; a higher level of care was indicated. At the latest quarterly review of Rosalinda's placement at CPT in August 2012, Nagafuji and his team considered placement options other than CPT, either in her mother's home or at a board-and-care home. He determined that such placements were not appropriate at that time because Rosalinda still required close mental health monitoring and ready access to on-site mental health professionals or psychiatrists. She also needed to be in a place that could deal with her aggressive behavior, and there were no unlocked facilities currently available that could meet Rosalinda's needs as well as CPT was meeting them. However, he did not rule out transitioning Rosalinda to a board-and-care or group home in the future if she were able to display stability for a long enough period of time.

We do not view Mr. Nagafuji's testimony as a statement that board-and-care homes were rejected as an appropriate placement because of lack of availability. Moreover, he was not the only witness whose testimony bore on the appropriateness of Rosalinda's placement at CPT, nor do we view his testimony in isolation. Dr. Turpin's testimony filled in the picture about Rosalinda's behavioral difficulties, and the necessity of moving her to the more restrictive Disruptive Behavioral Unit within CPT in order to deal with them. Rosalinda's mother's testimony shed light on the problems Rosalinda had previously encountered at home and in board-and-care homes, and on the type of care she would get if she were returned home. Rosalinda's mother also attested to the improvements in Rosalinda's behavior and outlook while at CPT. Taken together, the evidence was sufficient to establish that CPT was the least restrictive appropriate placement for Rosalinda.

### DISPOSITION

The judgment is affirmed.

20

_____

Dondero, J.

We concur:

_____

Margulies, Acting P.J.

_____

Becton, J.*

*People v. Rosalinda C., A138128*

_____

\* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Superior Court of Alameda County, No. RM08378235, Carlos G. Ynostroza, Judge.

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Jeffrey M. Laurence and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

*People v. Rosalinda C., A138128*