Filed 2/28/14  Conservatorship of Hans A. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Conservatorship of the Person of HANS A. | |
| THE PEOPLE,<br><br>　　　Petitioner and Respondent,<br><br>v.<br><br>HANS A.<br><br>　　　Objector and Appellant. | A138143<br><br>(Alameda County<br>Super. Ct. No. 02-053646) |

　　　　Hans A. (conservatee) was charged with the murder of his father in 2004.  After his arrest, the conservatee was found not mentally competent to stand trial.  When he failed to regain competence within three years, he was made the subject of a "Murphy conservatorship."[1]  In early 2013, after a hearing, the probate court granted a petition to extend the conservatorship for an additional year.  The conservatee contends his attorney erred in advising him not to speak about the killing of his father at the hearing and the probate court erred in granting the conservator authority over medical decisions unrelated to his mental disability.  We affirm.

---

　　　　[1] The proceeding is named after former Assemblyman Frank Murphy, who authored the legislation creating this basis for civil commitment in 1974.  (*In re Polk* (1999) 71 Cal.App.4th 1230, 1235.)

# I.  BACKGROUND

The conservatee was charged with the murder of his father in 2004.[2]  He admitted the killing to various law enforcement officers, explaining he was acting on instructions from God.  The following year, the conservatee was found incompetent to stand trial and was transferred from jail to a state hospital.  He was later found competent and returned to jail, but he then refused medication, quickly regressed, and was found not competent once more.  When the conservatee failed to regain mental competence after three years, he was made the subject of a Murphy conservatorship under Welfare and Institutions Code section 5008, subdivision (h)(1)(B) and admitted to a rehabilitation center for treatment.  The conservatorship has since been renewed annually.  At least by late 2012, the murder charges were still pending against the conservatee, although, by operation of statute, they were suspended by the finding of mental incompetence.  (Pen. Code, § 1370, subd. (a)(1)(B).)

The district attorney filed a petition to renew the Murphy conservatorship on January 7, 2013.  At the hearing on the petition, the parties stipulated to a decision on the basis of the reports of the two consulting psychiatrists.  The consultants were unanimous in concluding the conservatee remained gravely disabled, not competent to stand trial, a substantial danger to others, and not competent to make decisions about his medical care, both antipsychotic and otherwise.

According to their reports, the conservatee does not consider himself mentally ill.  Although under treatment with antipsychotic medication, he remains preoccupied with religious obsessions and convinced he is an agent of God.  When his prophecy is accepted by the public, he believes, he will be delivered by God, and his father will be

---

[2] The appellate record does not contain any records from the criminal proceedings. We base our account of the criminal proceedings on statements made in reports prepared by the mental health professionals who evaluated the conservatee.

resurrected.[3] The conservatee consistently maintains that he does not need antipsychotic medication. When permitted community passes in 2010, he used both alcohol and marijuana. If permitted to leave treatment, he plans to discontinue antipsychotic medication and obtain a permit for use of medical marijuana.

As to the criminal proceeding, the conservatee plans to plead not guilty by analogy to Abraham who, he believed, would not have been guilty of a crime had he followed through on God's instructions to sacrifice his son Isaac. The conservatee views a trial as central to fulfilling his prophecy and is adamant in refusing to plead not guilty by reason of insanity, except perhaps as a tactical maneuver after he has been found guilty.

Following counsels' argument at the hearing, the conservatee sought to read into the record a three-page statement. Although he was permitted to read the first few paragraphs requesting permission to establish a blog, his counsel advised the conservatee to cease reading the statement on Fifth Amendment grounds when it began to address the killing of his father. After discussion, the probate court proposed to accept the conservatee's statement under seal, allowing its review by the court without the risk of self-incrimination. The conservatee agreed to this approach. The court later entered an order extending the conservatorship.

## II. DISCUSSION

The conservatee contends his attorney erred in advising him not to address the court about the killing because "no action could be taken on the criminal charges" if the conservatorship is terminated, even if he were found competent to stand trial. He also argues the probate court's order depriving him of the right to make medical decisions unrelated to his mental disorder was not supported by substantial evidence.

### A. *Self-incrimination*

" 'It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial.'

---

[3] The conservatee also harbors a "passion" for the return of Jon Gruden as head coach of the Oakland Raiders, believing Gruden's return would "persuade the world of the righteousness of [the conservatee's] cause."

3

[Citation.] . . . [¶] A defendant who, as a result of a mental disorder, is adjudged not competent to stand trial on a felony charge may be committed to a state hospital for no more than three years. [Citations.] If, at the end of the three-year period, the medical staff determines there is no substantial likelihood the defendant will regain mental competence in the foreseeable future, the defendant must be returned to the court for further proceedings. [Citations.] . . . [¶] [I]f it appears to the court that the defendant is 'gravely disabled,' the court shall order the conservatorship investigator to initiate a 'Murphy conservatorship.' " (*People v. Reynolds* (2011) 196 Cal.App.4th 801, 806.)

A Murphy conservatorship is one of two grounds for civil commitment under the Lanterman-Petris-Short Act (LPS Act; Welf. & Inst. Code, § 5000 et seq.). (See *People v. Karriker* (2007) 149 Cal.App.4th 763, 774–775.) Under Welfare and Institutions Code section 5008, subdivision (h)(1)(B), a person is defined as "gravely disabled," and therefore subject to a conservatorship under section 5350, if the person has been charged with a felony resulting in serious injury or death, the charges have not been dismissed, and the person is not competent to stand trial. To address constitutional concerns, the Supreme Court also requires, in addition to the statutory criteria, that a defendant subject to a Murphy conservatorship be found to represent "a substantial danger of physical harm to others" as a result of a " 'mental defect, disease, or disorder.' " (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 176–177 (*Hofferber*).)

Welfare and Institutions Code section 5008, subdivision (h)(1)(B) was enacted in direct response to *In re Davis* (1973) 8 Cal.3d 798 (*Davis*), which held that the indefinite commitment of a defendant not competent to stand trial violates due process. *Davis* required that a defendant found unlikely to regain competence within a reasonable time either be released from detention or made subject to civil commitment proceedings under the LPS Act. (*Davis,* at p. 807; see *People v. Skeirik* (1991) 229 Cal.App.3d 444, 456 & fn. 13.) *Davis*, in turn, followed and implemented *Jackson v. Indiana* (1972) 406 U.S. 715, which reached the same conclusion. (*Davis*, at pp. 806–807; see generally *In re Polk, supra*, 71 Cal.App.4th 1230, 1236–1237 [reviewing history of Murphy conservatorship].)

4

Before addressing the merits of the conservatee's argument, we note three procedural difficulties. First, the assertion that his attorney made an "error" does not constitute a cognizable legal claim. To justify a reversal of the court's order on the basis of his attorney's conduct, the conservatee must demonstrate the attorney rendered ineffective assistance of counsel. (See *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, 1037, fn. 6.) A necessary element of such a claim is that his attorney's conduct was prejudicial. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.) This requires more than a showing that, as the conservatee argues, the advice "precluded him from presenting to the court information and argument he felt was urgent." Rather, the conservatee must show that the outcome of the hearing likely would have been different had his counsel not rendered ineffective assistance. (*Ibid.*)

There is no such likelihood here. Contrary to his claim, the conservatee was not prevented from communicating anything to the court. He wanted to read his statement in open court. Instead, with his consent, the probate court accepted and reviewed the statement under seal. Accordingly, the conservatee was merely prevented, as a result of counsel's advice, from reading his statement, not from communicating his statement altogether. Because there is no reason to believe the outcome of the hearing would have been different if the conservatee had read his statement to the court, rather than having it reviewed in camera, any error in counsel's advice had no impact on the outcome of the hearing.

Second, the conservatee likely forfeited any argument on the asserted ground when he agreed to the alternate procedure. (E.g., *People v. Whalen* (2013) 56 Cal.4th 1, 84.)

Finally, the criminal charges against the conservatee remained pending at the time of the hearing. Even if the charges are subject to dismissal, as the conservatee essentially

5

argues, until they actually have been dismissed his attorney was rightfully concerned to prevent self-incrimination.[4]

In any event, we find no merit in the conservatee's argument that the murder charges against him are no longer viable. Based on language in *Davis* and *Jackson*, the argument is premised on the assumption that, when he failed to regain mental competency after three years, the criminal charges against him could no longer be pursued. Contrary to his argument, nothing in *Davis*, *Jackson,* or the state or federal Constitutions mandates this result.

The conservatee's argument derives from the holding of both *Davis* and *Jackson* that a defendant who has not regained competence after a reasonable time must be either released or civilly committed. (*Davis, supra,* 8 Cal.3d at p. 807; *Jackson, supra,* 406 U.S. at p. 738.) As explained in *Jackson,* "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." (*Id.* at p. 738, fn. omitted.) As used here, "release" means to release the defendant from jail or other pretrial detention; it does not mean to release him or her from criminal liability. Neither case holds that, in addition to releasing or civilly committing the defendant, the state must dismiss the pending criminal charges.

On the contrary, the issue of automatic dismissal was implicitly addressed and rejected in *Jackson.* In that case, the defendant argued that, in addition to his release

---

[4] The conservatee actually argues not that the charges would be subject to dismissal but that "no action could be taken" on them. To the extent the conservatee means the charges would be suspended, any suspension would end with his being found competent. (Pen. Code, § 1370, subd. (a)(1)(B).) We therefore construe his argument as contending the charges would be subject to dismissal. (See Pen. Code, § 1385, subd. (a) [criminal charges can be dismissed in the furtherance of justice].)

from pretrial detention, "fundamental fairness requires that the charges against him now be dismissed." (*Jackson, supra,* 406 U.S. at p. 739.) Although the defendant had been detained for over three years, which the Supreme Court implied was a sufficient time to require his release or civil commitment (*id.* at p. 738), the court declined to hold that dismissal was an automatic consequence of his failure to regain competence during the pretrial detention. The court rejected his claim to have "already made out a complete insanity defense," noting the defendant's "criminal responsibility at the time of the alleged offenses . . . is a distinct issue from his competency to stand trial." (*Id.* at p. 739.) Although the court recognized that "[d]ismissal of charges against an incompetent accused has usually been thought to be justified on . . . the Sixth-Fourteenth Amendment right to a speedy trial, or the denial of due process inherent in holding pending criminal charges indefinitely over the head of one who will never have a chance to prove his innocence," it required the defendant to raise those issues on remand. (*Id.* at p. 740, fns. omitted.) It did not suggest dismissal was warranted as a matter of law. This directly refutes the conservatee's reading of *Jackson* as requiring automatic dismissal of charges against a defendant who fails to regain competence within a reasonable period of pretrial confinement.[5]

The conservatee treats the dismissal of pending charges as a logical consequence of the requirement that a defendant who fails to regain competence after a reasonable time must be either released or civilly committed. The reasoning behind the constitutional prohibition on the indefinite pretrial detention of an incompetent defendant, however, does not also require the dismissal of charges against a defendant who fails to regain competence within a reasonable time. As the Supreme Court noted in *Jackson*, competence to stand trial is a different issue from criminal insanity. (*Jackson, supra,*

---

[5] The conservatee argues that "*Jackson* and *Davis* offer no basis for reinstating the criminal proceedings" after a reasonable time of pretrial detention without a restoration of competence. This is presumably because neither case mandates dismissal of the charges in the first place, making it unnecessary to address their reinstatement. By statute in California, criminal charges against a mentally incompetent defendant are merely suspended. (Pen. Code, § 1370, subd. (a)(1)(B).) They are not dismissed.

7

406 U.S. at p. 739.) A defendant who is not competent to stand trial remains criminally responsible for his or her crimes, and the failure to regain mental competence within three years does not alone absolve the defendant of that responsibility. It may well be that the defendant will ultimately be found not guilty by reason of insanity should he or she become competent and stand trial. In the absence of a formal resolution of the criminal charges, however, whether by trial or a dismissal in the interests of justice (Pen. Code, § 1385, subd. (a)), neither *Davis* nor *Jackson* provides a rationale for releasing an incompetent defendant from criminal responsibility.[6]

The conservatee argues that if dismissal of charges is not mandated after three years, the state could evade *Davis* and *Jackson* "by putting [a defendant] on the *Murphy* conservatorship, renewable annually and indefinitely, and then when he no longer qualifies for the *Murphy* conservatorship, put him on trial, effectively taking as long as necessary . . . to restore him to competency . . . ." The argument misunderstands both the cases and the nature of a Murphy conservatorship. *Davis* and *Jackson* hold that an incompetent defendant cannot be confined indefinitely solely on the premise of detention awaiting trial. Neither case, however, holds that the expiration of a reasonable time of pretrial detention without a restoration of competency precludes the state from further criminal proceedings against the defendant, should he or she ever regain competence. Rather, they hold only that, "[i]f there is no substantial probability the defendant will regain competence, the state must justify further confinement by showing that it is necessary on some ground applicable to all mentally ill persons." (*In re Polk*, *supra*, 71 Cal.App.4th at p. 1236.) Contrary to the implication in the conservatee's argument, a Murphy conservatorship does not constitute pretrial detention by another name. Unlike pretrial detention, the decision to grant the conservatorship is not based on the pendency

---

[6] The conservatee argues that not to release a defendant whose Murphy conservatorship is terminated could constitute a violation of equal protection under certain circumstances. Because his conservatorship has not yet ended, he lacks standing to assert that particular objection, and we do not address it. (*People v. Garcia* (1999) 21 Cal.4th 1, 11–12.)

of criminal charges. Consistent with the requirement in *Jackson* that further detention must be consistent with the treatment of mentally ill persons generally, a Murphy conservatorship is available only if a defendant constitutes "a substantial danger of physical harm to others" as a result of a " 'mental defect, disease, or disorder.' " (*Hofferber, supra*, 28 Cal.3d at pp. 176–177.) Accordingly, for the state to pursue criminal charges against a defendant who has recovered competence while subject to a Murphy conservatorship would not necessarily contravene the constitutional premises of *Davis* and *Jackson.*

Further, the Penal Code contains a safety valve to prevent injustice in these circumstances. In the absence of civil commitment proceedings, a criminal defendant cannot be detained while incompetent for a term longer than the maximum term of the most serious offense of which he or she is charged. (Pen. Code, § 1370*,* subd. (c)(1).) Section 1370, subdivision (d) expressly notes that the criminal action against a defendant who has failed to regain competence within the statutory period "remains subject to dismissal pursuant to Section 1385," which permits the dismissal of a criminal action "in furtherance of justice." A defendant whose period of incompetence exceeds the term of punishment for the charged crimes, for example, presumably would be entitled to a section 1385 dismissal. Other situations would be handled on a case-by-case basis, as justice requires.

## B. *Nonpsychological Medical Care*

The conservatee contends the provision of the probate court's order depriving him of the right to make medical decisions concerning conditions unrelated to his mental disorder was not supported by substantial evidence.

Welfare and Institutions Code section 5357 provides that the court may impose certain special disabilities on a conservatee, including those imposed by the court in the present case. (§ 5357, subds. (a), (b), (d)–(f).) A finding of grave disability alone is not sufficient to justify the imposition of the various special disabilities enumerated in section 5357. (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165 (*George H.*).) The conservatee retains the rights and privileges covered by the special

disabilities unless the court, after making separate findings of incapacity to support the imposition of the special disabilities, imposes those disabilities and confers corresponding authority on the conservator. (*Ibid.*) With respect to the particular disability cited by the conservatee, "before a trial court may impose a medical disability pursuant to section 5357[, subdivision] (d), the court must find that the conservatee . . . is incapable of making rational decisions about medical treatment related to his or her own grave disability, that is, lacks the mental capacity to rationally understand the nature of the medical problem, the proposed treatment, and the attendant risks." (*K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 180.) Substantial evidence must support the findings underlying the imposition of a disability. (*Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 347–348.)

In its order granting the conservator the power to "authorize routine medical treatment," the probate court found that the conservatee is "incapable of weighing the risks and benefits of psychotropic medications and routine medical treatment and is, therefore, incapable of giving informed consent."[7] This finding was supported by substantial evidence. Both consultants concluded the conservatee was incompetent to make decisions regarding medical care unrelated to his mental illness. Their reports demonstrate that he suffers from delusions that seriously impair his perception of reality, including delusions about his health. Despite the overwhelming evidence of his disability, he consistently denied he had a mental illness and took the prescribed medications only under protest. When in jail and not under compulsion to take antipsychotic medication, he refused. Yet he swore by medical marijuana. This evidence supports the finding that the conservatee is incompetent to make medical decisions, since it demonstrates a lack of awareness or acknowledgment of his condition, an inability to understand proposed interventions, and an inability to understand and evaluate the

---

[7] The conservatee contends the probate court was additionally required to make express findings with respect to the various factors listed in Probate Code section 1881, but we are unaware of any decision requiring such findings. (See *K.G. v. Meredith, supra,* 204 Cal.App.4th at p. 180 [setting out necessary findings].)

10

information given to him and participate in treatment decisions with a rational thought process.

The conservatee argues this evidence related only to the medication prescribed for treatment of his mental illness, but there is no reason to believe he would not be similarly unrealistic about other types of medical intervention, should they be necessary. There is no requirement that the imposition of disabilities be supported by evidence specifically relating to those disabilities. Rather, we apply "the usual rules" of appellate review and " 'presume in favor of the judgment every finding of fact necessary to support it warranted by the evidence.' " (*George H., supra,* 169 Cal.App.4th at p. 165.)

### III. DISPOSITION

The order of the probate court is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Banke, J.


_____
Becton, J.[*]

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.